UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------x

                                     :

INVISTA S.à.r.l., INVISTA Technologies    :
S.à.r.l., and INVISTA North America S.à.r.l.,    :

                                     :

           Plaintiffs,         :

                                     :    No. 08 CV 7270 (BSJ/DCF)

            v.            :

                                     :    ECF Case

E.I. Du Pont de Nemours and Company and    :
Rhodia S.A.,    :

                                     :

           Defendants.       :

                                     :

                                     :

---------------------------------------------------------x

### MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT RHODIA S.A.'S MOTION TO DISMISS OR STAY PROCEEDINGS IN FAVOR OF ARBITRATION

**REDACTED TO REMOVE REFERENCES TO DOCUMENTS
FILED UNDER SEAL PURSUANT TO ORDER DATED SEPTEMBER 23, 2008**

Jonathan L. Greenblatt
Henry Weisburg
Neil H. Koslowe
Christopher M. Ryan
SHEARMAN & STERLING LLP
599 Lexington Avenue
New York, NY 10022-6069
Telephone: (212) 848-4000
Facsimile: (212) 848-7179
jgreenblatt@shearman.com

Attorneys for Defendant
Rhodia S.A.

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................................. ii

INTRODUCTION ........................................................................................................... 1

STATEMENT OF FACTS .............................................................................................. 3

    I.    THE BUTACHIMIE JOINT VENTURE ........................................................... 3

        A.    The Formation of the Joint Venture ........................................................ 3

        B.    The Joint Venture Agreement and Ancillary Agreements ...................... 4

    II.   THE HISTORY OF THE DISPUTE ................................................................. 5

        A.    The ICC Arbitration ................................................................................ 5

        B.    The Texas Litigation ............................................................................... 8

        C.    The Gen III Litigation—Invista's Prior Attempt to Avoid Arbitration .............. 11

        D.    The Present Litigation ........................................................................... 12

ARGUMENT .................................................................................................................. 13

    I.    THE COURT SHOULD DISMISS THIS ACTION IN FAVOR OF
        ARBITRATION ................................................................................................ 13

        A.    Plaintiffs' Claims Are Arbitrable "Disputes" Within the Meaning of
            Article 23 of the JVA ............................................................................. 14

        B.    Rhodia S.A. May Compel Invista to Arbitrate Its Claims Even Though
            Rhodia S.A. Is Not a Signatory to the JVA ........................................... 20

        C.    Invista May Not Avoid the Obligation to Arbitrate Under the JVA .................. 26

    II.   ALTERNATIVELY, THIS COURT SHOULD STAY THIS ACTION IN
        FAVOR OF THE PENDING ICC ARBITRATION ........................................ 28

        A.    This Court Should Stay This Action Under Section 3 of the FAA ...................... 30

        B.    This Court Should Stay This Action Pursuant to Its Inherent Powers ................. 33

CONCLUSION ............................................................................................................... 34

# TABLE OF AUTHORITIES

## CASES

*Acevedo Maldonado v. PPG Indus., Inc.*, 514 F.2d 614 (1st Cir. 1975) .......................................15

*Am. Bureau of Shipping v. Tencara Shipyard S.P.A.*, 170 F.3d 349 (2d Cir. 1999).......................28

*Am. Shipping Line, Inc. v. Massan Shipping Indus., Inc.*, 885 F. Supp. 499 (S.D.N.Y. 1995) .....33

*Astra Oil Co. v. Rover Navigation, Ltd.*, 344 F.3d 276 (2d Cir. 2003)...................................24, 32

*Best Concrete Mix Corp. v. Lloyd's of London Underwriters*, 413 F. Supp. 2d 182
    (E.D.N.Y. 2006).............................................................................................................28

*Birmingham Assocs. Ltd. v. Abbott Labs.*, 547 F. Supp. 2d 295 (S.D.N.Y. 2008) .................25, 33

*Bishop v. Smith Barney, Inc.*, No. 97 CV 4807, 1998 WL 50210 (S.D.N.Y. Feb. 6, 1998).........21

*Calder v. Jones*, 465 U.S. 783 (1984).........................................................................................10

*Camferdam v. Ernst & Young Int'l, Inc.*, No. 02 CV 10100, 2004 WL 307292
    (S.D.N.Y. Feb. 13, 2004)................................................................................................23

*Carroll v. LeBoeuf, Lamb, Greene & MacRae LLP*, 374 F. Supp. 2d 375 (S.D.N.Y. 2005)........24

*Chase Mortgage Co.-West v. Bankers Trust Co.*, No. 00 CV 8150, 2001 WL 547224
    (S.D.N.Y. May 23, 2001)................................................................................................23

*Choctaw Generation L.P. v. Am. Home Assurance Co.*, 271 F.3d 403 (2d Cir. 2001) ...........22, 25

*Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213 (1985)...........................................................15

*Deloitte Noraudit A/S v. Deloitte Haskins & Sells, U.S.*, 9 F.3d 1060 (2d Cir. 1993)...................28

*Denney v. BDO Seidman LLP*, 412 F.3d 58 (2d Cir. 2005)...........................................................24

*Doctor's Assocs. Inc. v. Distajo*, 107 F.3d 126 (2d Cir. 1997).....................................................32

*Flightdocs, Inc. v. Jackson*, No. 04 CV 4840, 2005 WL 2038588 (E.D.N.Y. Aug. 23, 2005) .....25

*Fluor Daniel Intercontinental, Inc. v. Gen. Elec. Co.*, No. 98 CV 7181, 1999 WL 637236
    (S.D.N.Y. Aug. 20, 1999) ...............................................................................................26

*Genesco, Inc. v. T. Kakiuchi & Co., Ltd.*, 815 F.2d 840 (2d Cir. 1987) ...........................15, 31, 32

*Gidatex S.R.L. v. Campaniello Imports, Ltd.*, 13 F. Supp. 2d 420 (S.D.N.Y. 1998)....................32

*Gingiss Int'l Inc. v. Bormet*, 58 F.3d 328 (7th Cir. 1995)....................................................32

*Grigson v. Creative Artists Agency LLC*, 210 F.3d 524, 528 (5th Cir. 2000) ...............................26

*Gvozdenovic v. United Air Lines Inc.*, 933 F.2d 1100 (2d Cir. 1991) ...........................................12

*Hartford Accident & Indem. Co. v. Swiss Reinsurance Am. Corp.*, 246 F.3d 219
   (2d Cir. 2001).................................................................................................................14

*IDS Life Ins. Co. v. SunAmerica, Inc.*, 103 F.3d 524 (7th Cir. 1996)............................................30

*Invista N. Am. SÀRL v. Rhodia Polyamide Intermediates S.A.S.*,
   503 F. Supp. 2d 195 (D.D.C. 2007) .......................................................................11,12, 21

*J.J. Ryan & Sons, Inc. v. Rhone Poulenc Textile, S.A.*, 863 F.2d 315
   (4th Cir. 1988).................................................................................................................15

*JLM Indus., Inc. v. Stolt-Nielsen SA*, 387 F.3d 163 (2d Cir. 2004) ......................................*passim*

*MAG Portfolio Consult GMBH v. Merlin Biomed Group LLC*, 268 F.3d 58
   (2d Cir. 2001)...........................................................................................................27, 28

*Massen v. Cliff*, No. 02 CV 9282, 2003 WL 2012404 (S.D.N.Y. May 1, 2003).........................24

*Miron v. BDO Seidman LLP*, 342 F. Supp. 2d 324 (E.D. Pa. 2004) ............................................25

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614 (1985)................14, 15

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1 (1983)................................15

*Oldroyd v. Elmira Savings Bank, FSB*, 134 F.3d 72 (2d Cir. 1998)..............................................31

*Orange Chicken L.L.C. v. Nambe Mills, Inc.*, No. 00 CV 4730, 2000 WL 1858556
   (S.D.N.Y. Dec. 19, 2000) ...............................................................................................33

*Paramedics Electromedicina Comercial, Ltda. v. GE Med. Sys. Info. Techs., Inc.*,
   369 F.3d 645 (2d Cir. 2004)............................................................................................14

*Penzoil Exploration & Prod. Co. v. Ramco Energy Ltd.*, 139 F.3d 1061 (5th Cir. 1998)............15

*Ross v. Am. Express Co.*, 478 F.3d 96 (2d Cir. 2007).................................................................31

*Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716 (9th Cir. 1999).....................................................15, 32

*Smith/Enron Cogeneration L.P., Inc. v. Smith Cogeneration Int'l, Inc.*, 198 F.3d 88
    (2d Cir. 1999) ................................................................................24, 32

*Sunkist Soft Drinks, Inc. v. Sunkist Growers, Inc.*, 10 F.3d 753 (11th Cir. 1993) ........................15

*Thixomat, Inc. v. Takata Physics Int'l Co., Ltd.*, No. 01 CV 5449, 2001 WL 863566
    (S.D.N.Y. July 30, 2001) ................................................................25

*Thomson-CSF S.A. v. Am. Arbitration Ass'n*, 64 F.3d 773 (2d Cir. 1995) ....................20, 21, 22

*Vaughn v. Leeds, Morelli & Brown, P.C.*, No. 04 CV 8391, 2005 WL 1949468
    (S.D.N.Y. 2005) ................................................................................24

*WorldCrisa Corp. v. Armstrong*, 129 F.3d 71 (2d Cir. 1997) ................................................15, 30

## STATUTES

9 U.S.C. § 3 ...............................................................................2, 28, 30, 32

9 U.S.C. § 4 ................................................................................................2

9 U.S.C. § 202 ...........................................................................................13

9 U.S.C. § 205 .............................................................................................9

9 U.S.C. § 206 .......................................................................................2, 13

9 U.S.C. § 208 .......................................................................................2, 30

# INTRODUCTION

Plaintiffs' lawsuit is intended to do one thing—to secure Invista's dominant hold on the adiponitrile ("ADN") market by stopping Rhodia S.A. from pursuing the possibility of constructing the first new ADN plant since 1983.[1]  To do that, Plaintiffs have made allegations against Rhodia S.A. relating to a single issue—Rhodia S.A.'s right to use certain technical information in the planning, design, and construction of a new ADN plant.  As demonstrated below, that issue is inextricably linked to the terms of a series of contracts governing the use and disclosure of the purported "trade secrets" at issue in this case.  Each of those contracts contains a mandatory arbitration provision requiring disputes arising in connection with their terms to be resolved by arbitration.  In compliance with those requirements, Rhodia S.A. and two of its subsidiaries (Rhodianyl SNC and Rhodia Opérations S.A.S.) have submitted the very issue in dispute in this case to a tribunal of arbitrators empanelled under the International Chamber of Commerce's Rules of Arbitration (the "ICC Arbitration") sitting in Paris.[2]  This lawsuit is Plaintiffs' latest attempt to circumvent the arbitration provisions and commence parallel litigation in the United States.  That attempt must fail.  Because this dispute falls within the scope of the relevant arbitration agreements, it must be arbitrated and the complaint must be dismissed pursuant to the Federal Arbitration Act.  At a very minimum, this suit should be stayed pending the outcome of the ICC Arbitration.

At the September 11, 2008 status conference, Plaintiffs' counsel argued that this case cannot be sent to arbitration because Plaintiffs are not parties to the relevant arbitration

---

[1] Adiponitrile is a chemical precursor used in the manufacture of nylon.

REDACTED

1

agreements and because the agreement pursuant to which the ICC Arbitration was initiated "does not address the issue of who has the right to Invista's trade secrets."[3]  As discussed below, those arguments fail.  *First*, the law simply does not allow Plaintiffs to select non-signatory but related parties to the arbitration agreements in an attempt to avoid the duty to arbitrate.  Under various equitable principles, Rhodia S.A. may invoke and Plaintiffs' are estopped from denying the duty to arbitrate this dispute.  *Second*, regardless of whether Invista S.a r.l. and Invista North America S.a. r.l. ("Invista NA") are ultimately found to be proper respondents to the arbitration, the arbitration will continue between the Rhodia and Invista parties to the arbitration agreement.  *Third*, the tribunal will determine both Rhodia S.A.'s rights under the relevant agreements to use certain technical information outside of the joint venture and whether the specific documents that Rhodia S.A. intends to use are in fact usable.  Thus, the factual questions underlying Plaintiffs' claims in this case will be resolved in that ongoing arbitration.  *Fourth*, regardless of whether Rhodia S.A. brought its arbitration under one contract or a dozen contracts, the fact remains that each of the relevant contracts contains an enforceable arbitration clause.  Disputes arising in connection with those agreements, therefore, are arbitrable and are not properly the subject of a U.S. litigation.

To allow this litigation to go forward would undermine the federal policy favoring arbitration, create the risk of inconsistent judgments, and reward Plaintiffs' forum shopping.  Rhodia S.A., therefore, respectfully requests that this Court dismiss or stay these proceedings pursuant to the Federal Arbitration Act, 9 U.S.C. §§ 3, 4, 206, or the Court's inherent power to manage its own docket.[4]

---

[3] Greenblatt Decl., Ex. L, Transcript of Status Conference ll. 41:22–42:6, 42:24–25, *Invista S.à.r.l., et al. v. E.I. Du Pont de Nemours and Company, et al.*, No. 08 CV 7270 (Sept. 11, 2008).

[4] 9 U.S.C. §§ 3 and 4 are applicable to foreign arbitration agreements by virtue of 9 U.S.C. § 208.

## STATEMENT OF FACTS

**I.    THE BUTACHIMIE JOINT VENTURE**

**A.    The Formation of the Joint Venture**

In the early 1970s, E.I. DuPont de Nemours ("DuPont") began exploring the possibility of manufacturing adiponitrile ("ADN")—a chemical precursor in the production of nylon—in Europe. Rather than attempt to enter the European market alone, DuPont elected to enter into a partnership with a European company already established in the chemical intermediates field. Accordingly, on April 23, 1974, DuPont de Nemours (France) S.A., a subsidiary of DuPont, and Societe Des Usines Chimiques Rhône-Poulenc ("SUCRP"), a subsidiary of Rhône-Poulenc S.A. ("Rhône-Poulenc") executed a joint venture agreement (hereinafter the "JVA") and a number of ancillary agreements regarding the financing, structure, management, and operation of the ADN facility.[5] Under the terms of the agreement, each party would own half of a *societe en nom collectif* ("SNC") created for the "the manufacture and sale of adiponitrile."[6] The commercial name of the SNC was "Butachimie."

DuPont had recently developed a new cost effective process for manufacturing ADN through the hydrocyanation of butadiene—the "Gen I" process. The parties agreed that DuPont would contribute the initial technology to the joint venture because of its cost effectiveness, and that SUCRP would design and construct the manufacturing facility.[7] It was further agreed that SUCRP would provide the employees necessary to operate the ADN plant

---

[5] Greenblatt Decl., Ex. A, ADN Venture Agreement between Du Pont de Nemours (France) S.A. and Société Des Usines Chimiques Rhône-Poulenc, dated April 23, 1974 (the "JVA") § 2.2.

[6] *See id.*

[7] The ADN produced by the Gen I process is chemically equivalent to ADN produced through other methods. The advantage of the Gen I process is its cost efficiency.

3

and would make its engineering department available to provide technical assistance to the joint venture.[8]

As described below, the JVA and a number of the ancillary agreements dealt with the confidentiality and use of technical information provided in connection with the joint venture. Each of the those agreements required that (a) recipients of confidential technical information not use or disclose such information for a period of 15 years from the date of receipt; (b) all disputes arising in connection with the agreements be resolved by ICC arbitration in France; and (c) all disputes be resolved in accordance with French law.

Butachimie commenced production on January 1, 1978, with a capacity of 102 kilotons per year.[9] As a result of improvements in plant efficiency and various projects undertaken by the partners, Butachimie's capacity has been expanded several times since start-up, most recently to 519 kilotons per year.

The ownership of Butachimie has been transferred several times since SUCRP and DuPont France entered into the JVA. Today, SUCRP's shares are held by Rhodianyl. DuPont transferred its shares in Butachimie to KoSa France Holding S.à.r.l. ("KoSa France"), a subsidiary of Koch Industries, .

**B.      The Joint Venture Agreement and Ancillary Agreements**

The JVA is the umbrella agreement that governs the manner in which Butachimie is to be operated. In addition to the JVA, there are a series of ancillary agreements that relate to Butachimie's operations. Some of these agreements were executed at the time the JVA was signed. Others were executed later, as specific needs arose or to amend earlier agreements. Article IX of the JVA governs the use and period of confidentiality of Gen I technical

---

[8] Greenblatt Decl., Ex. C, JVA, Exhibit D; *id.*, Ex. D, JVA, Exhibit F; *id.*, Ex. E, JVA, Exhibit G.

[9] Greenblatt Decl., Ex. A § 1.1.

information provided to either party by the other party, or by Butachimie. Several of the ancillary agreements contemplate the provision of Gen I information to one or both of the parties to enable them to provide services to Butachimie. The ancillary agreements also contain clauses governing the use and period of confidentiality with respect to that information. Every agreement that addresses the confidentiality and use of Gen I information permits the recipient of such information to disclose or use such information outside of the joint venture relationship no later than 15 years after the date of receipt. And every one of those agreements requires that disputes be resolved through ICC arbitration in Paris. A chart containing the confidentiality and arbitration provisions for each agreement is appended to the end of this Memorandum as Annex A. The relevant pages from each agreement are attached as Exhibits A through F to the Declaration of Jonathan L. Greenblatt in Support of Defendant Rhodia S.A.'s Motion to Dismiss or Stay Proceeding in Favor of Arbitration.

## II.    THE HISTORY OF THE DISPUTE

### A.    The ICC Arbitration

In the summer of 2007, in connection with an unrelated dispute between various Rhodia and Invista parties, Invista S.à.r.l. accused Rhodia S.A. of misappropriating technology referred to as "Gen III" for use in an ADN facility in Asia. On September 7, 2007, Rhodianyl and Rhodia Polyamide Intermediates S.A.S. ("Rhodia PI")—subsidiaries of Rhodia S.A.— denied Invista's accusations and stated that "Rhodia has never used the Gen III technology . . . and does not plan to use it in Asia [or elsewhere]."[10]

On September 28, 2007, Invista S.à.r.l. sent a letter to counsel for Rhodia S.A. declaring that, in light of Rhodianyl and Rhodia PI's representation, "Rhodia" must be intending

---

[10] *See* Greenblatt Decl. ¶¶ 11, 12.

to use Gen I technology to build a plant in Asia, and that "Rhodia" was prohibited "without limitation" from using or disclosing that technology outside of the Butachimie joint venture.[11]



REDACTED

---

[11] *See id.* ¶ 13.

[12] *Id.* ¶ 14.

[13] *Id.*

[14] *Id.* ¶ 15.

[15] *Id.*

[16] *Id.* ¶ 16.



---

[17] *Id.* ¶ 17.

REDACTED

[19] Greenblatt Decl., Ex. I at 3.

[20] *Id.*

REDACTED

[22] *Id.* Those allegations directly parallel allegations Invista S.à.r.l's claims of misappropriation against Rhodia S.A. in this action.  In its Complaint, Invista S.à.r.l. states that "Rhodia obtained the Trade Secrets in part from its own employees . . . who worked at or on behalf of Butachimie and who attended technical exchange meetings in the United States . . . .  These employees owed duties of loyalty and confidentiality and were precluded from sharing the Trade Secrets they learned while at Butachimie or during technical



REDACTED

### B.    The Texas Litigation

On October 9, 2007, four days after being notified of the ICC Arbitration,

Invista S.à.r.l. filed an Original Petition (the equivalent of a complaint) in Texas state court,

alleging that Rhodia S.A., by virtue of its control over its subsidiary Rhodianyl, misappropriated

and converted Invista's Gen I process to construct an ADN plant in Asia.[25]  Invista S.à.r.l. also

alleged the common law tort of unfair competition.[26]  Invista sought damages, equitable

remedies, and a permanent injunction "barring Rhodia S.A. and its agents from making any use

---

exchange sessions for any purpose other than for the sole use and benefit of the Butachimie joint
venture."  Compl. ¶ 110.

[23] Greenblatt Decl., Ex. J, Counterclaims at 7.

[24] Greenblatt Decl., Ex. I at 6.

[25] Greenblatt Decl., Ex. K, Original Pet. ¶¶ 4-7, 32, 72-76.

[26] *Id.* ¶¶ 68-71.

or disclosure of" Invista's Gen I technical information for any activity outside of its originally intended purpose.[27]

On November 2, 2007, Invista S.à.r.l. filed motions for temporary injunction and expedited discovery.[28] On November 5, 2007, Rhodia S.A. filed a Special Appearance in the Texas state court—a procedural vehicle that allows foreign defendants to challenge personal jurisdiction.[29] On November 13, 2007, Rhodia S.A. removed the case to the United States District Court for the Eastern District of Texas under 9 U.S.C. § 205.[30] The case was assigned to Judge Marcia Crone. Upon removal, Invista S.à.r.l.'s state court motions were mooted.

On November 20, 2007, Rhodia S.A. filed a motion to dismiss or stay in favor of the pending ICC Arbitration.[31] On December 6, 2007—more than three weeks from the date of removal—Invista re-urged its Motion for Temporary Injunction and Expedited Discovery before Judge Crone.[32] The parties fully briefed their respective motions.

On January 11, 2008, Judge Crone held a status conference. At the conference, the Court indicated it wished to proceed with Rhodia S.A.'s jurisdictional objections and permitted Invista to take jurisdictional document discovery and deposition testimony from Rhodia S.A. Invista informed Judge Crone that it intended to file an amended motion for preliminary injunction (despite the fact that its original motion was fully briefed) and requested

---

[27] *Id.* ¶ 83.

[28] Greenblatt Decl. ¶ 27.

[29] *Id.*

[30] *Id.*

[31] *Id.* ¶ 28.

[32] *Id.*

discovery in aid of its motion. Judge Crone permitted Invista some injunction-related discovery.[33]

In response to Invista's discovery requests, Rhodia S.A. collected and reviewed well over 100,000 documents. In addition, it produced three witnesses from France for deposition: Jean-Pierre Labroue, the General Counsel of Rhodia S.A; Yves Komorn, an employee of Rhodia Opérations; and Guy-Nöel Sauvion, also an employee of Rhodia Opérations.[34]

In late April 2008, Judge Crone modified the scheduling order to stay all briefing on the motion for preliminary injunction until after she decided the issue of personal jurisdiction.[35] In the course of briefing, Invista S.à.r.l. alleged that Rhodia S.A. was subject to (1) general jurisdiction in Texas by virtue of its own direct contacts with Texas; (2) general jurisdiction over Rhodia S.A. in Texas because of Rhodia S.A.'s control over affiliates with continuous and systematic contacts with Texas; and (3) specific jurisdiction over Rhodia S.A. under the Supreme Court's decision in *Calder v. Jones*, 465 U.S. 783 (1984), because Rhodia S.A. committed an intentional tort targeted at Texas.[36]

Because of the volume of briefs and attachments, and the complex corporate structures involved, Judge Crone ordered a full evidentiary hearing for June 5, 2008. Invista filed a motion seeking to compel Rhodia S.A. to produce four witnesses at the hearing: Mr. Labroue, Mr. Komorn, Mr. Sauvion, and Mr. James Harton, the President of Rhodia Inc. (a U.S. entity within the Rhodia group). The Court granted Invista's motion. The evidentiary hearing

---

[33] *Id.* ¶ 29.

[34] *Id.* ¶ 30.

[35] *Id.* ¶ 31.

[36] *Id.*

occurred as scheduled on June 5, 2008, beginning at 9:13 a.m. and ending at 10:33 p.m. Excluding breaks, the Court heard testimony and argument for 9 hours and 35 minutes, during the course of which six witnesses testified—all of whom were called by Invista S.à.r.l.[37]

On August 15, 2008, before Judge Crone had ruled on Rhodia S.A.'s motions to dismiss for lack of personal jurisdiction, and to compel arbitration, Invista S.à.r.l. filed notice under Federal Rule of Civil Procedure 41(a) that it was dismissing the Texas litigation.[38]

### C.    The Gen III Litigation—Invista's Prior Attempt to Avoid Arbitration

Unfortunately, this is not the first time Rhodia has had to seek judicial assistance in forcing Invista entities to adhere to their contractual obligations to arbitrate disputes arising in connection with Butachimie.  On December 22, 2006, in connection with a dispute concerning the Gen III technology, Invista NA (one of the plaintiffs in this action) initiated a lawsuit against Rhodia PI in the United States District Court for the District of Columbia, alleging that Rhodia PI was improperly using confidential information.  Rhodia PI and its affiliate Rhodianyl, however, had already commenced an arbitration over many of the same issues pursuant to the arbitration clause in the relevant contract.  Additionally, on December 29, 2006 (seven days after the complaint was filed), Invista NA itself initiated an arbitration against Rhodia PI and Rhodianyl under the same contract alleging overlapping claims (and seeking overlapping relief) as those raised in its litigation.[39]  Although other Rhodia entities were parties to the governing agreement, Rhodia PI was not.  Nevertheless, to avoid the contention that it was seeking to escape the outcome of the arbitration, Rhodia PI did not challenge the arbitral tribunal's

---

[37] *Id.* ¶ 33.

[38] *Id.* ¶ 34.

[39] *See Invista N. Am. SÀRL v. Rhodia Polyamide Intermediates S.A.S.*, 503 F. Supp. 2d 195, 202 (D.D.C. 2007).

jurisdiction and affirmatively stated that it would be bound by the Confidentiality Agreement for purposes of the pending litigation.[40]

Rhodia PI successfully moved to dismiss Invista's claims in favor of the pending arbitration. In support of its motion, Rhodia PI argued that it had assumed the Confidentiality Agreement's obligations and thus was entitled to invoke that agreement's arbitration clause. Rhodia PI also affirmed to the court that it was bound by the substantive obligations of the Confidentiality Agreement for purposes of the litigation and pending arbitration. The court agreed with Rhodia PI and held that Rhodia PI's affirmative statements and "preparation for arbitration demonstrate[d] that it had assumed the obligation to arbitrate."[41]

Invista appealed the district court's decision to the United States Court of Appeals for the Federal Circuit. The appeal has been fully briefed and argued, and is awaiting decision.[42]

**D.    The Present Litigation**

The same day Invista voluntarily dismissed its action in Texas, it joined with two of its affiliates in filing this suit. Plaintiffs' Complaint states seven causes of action against Rhodia S.A.: (1) unfair competition under the Lanham Act (Section 44) and Paris Treaty, (Compl. ¶¶ 92–98) ("Count I"); (2) violation of Section 43(a) of the Lanham Act, (*id.* ¶¶ 99-105) ("Count II"); (3) misappropriation of trade secrets, (*id.* ¶¶ 106-14) ("Count III"); (4) unfair competition, (*id.* ¶¶ 124-33) ("Count V"); (5) tortious inference with DuPont's contract with Plaintiffs (*id.* ¶¶ 158-62) ("Count IX"); (6) conversion (*id.* ¶¶ 163-71) ("Count X"); and (7)

---

[40] Greenblatt Decl. ¶ 36.

[41] *Invista N. Am. SARL*, 503 F. Supp. 2d at 202 (citing *Gvozdenovic v. United Air Lines Inc.*, 933 F.2d 1100, 1105 (2d Cir. 1991) (noting that participation in arbitration demonstrates a party's clear intent to arbitrate the dispute even if the party is not a signatory to the arbitration agreement)).

[42] Greenblatt Decl. ¶ 38.

civil conspiracy to "thwart Invista's share of the market" (*id.* ¶¶ 176-81) ("Count XII").

Plaintiffs seek injunctive relief, damages, and attorney fees.

## ARGUMENT

## I.    THE COURT SHOULD DISMISS THIS ACTION IN FAVOR OF ARBITRATION

Article 23 of the JVA and each of the arbitration provisions described above

constitute "foreign arbitration agreements" within the meaning of Section 202 of the Federal

Arbitration Act ("FAA" or "the Act").[43]  As a result, this Court must "direct that arbitration be

held in accordance with" those agreements.[44]

Despite the contractual requirement that disputes arising "in connection with" the

Butachimie joint venture be arbitrated, Plaintiffs have tried to mold their Complaint to avoid

arbitration.  The law, however, does not countenance such blatant manipulation.  As discussed

below, there are three reasons why this dispute should be dismissed in favor of arbitration.

*First*, Plaintiffs' claims are arbitrable.  Although Plaintiffs allege violations of the

Lanham Act and various business torts, each of the arbitration provisions in the relevant

contracts expressly states that "all disputes" arising "in connection" with its terms shall be

---

[43] 9 U.S.C. § 202 provides:

> An arbitration agreement or arbitral award arising out of a legal relationship, whether contractual or not, which is considered as commercial, including a transaction, contract, or agreement described in section 2 of this title, falls under the Convention.  An agreement or award arising out of such a relationship which is entirely between citizens of the United States shall be deemed not to fall under the Convention unless that relationship involves property located abroad, envisages performance or enforcement abroad, or has some other reasonable relation with one or more foreign states.  For the purpose of this section a corporation is a citizen of the United States if it is incorporated or has its principal place of business in the United States.

The agreements set forth above (a) arise out of a legal relationship (the Butachimie joint-venture relationship) and (b) contain at least one foreign (i.e., non-U.S.) party.  Thus, the arbitration provisions fall squarely within the scope of the FAA and within the U.S. federal policy in favor of arbitration.

[44] *See* 9 U.S.C. § 206.

13

resolved through arbitration.[45]  The Second Circuit has held that such language should be construed broadly to include contract claims as well as statutory causes of action and business torts related to rights and obligations under the agreement.

*Second*, although Rhodia S.A. is not a signatory to the relevant arbitration agreements, it may nevertheless invoke those agreements for two reasons: (a) Rhodia S.A.'s conduct shows an intent to arbitrate this dispute and, thus, as a matter of law, Rhodia S.A. is deemed to have assumed the applicable arbitration agreements; and (b) the doctrine of equitable estoppel permits Rhodia S.A. to invoke the arbitration agreements because Plaintiffs' claims rely on the terms of the underlying contracts and allege concerted misconduct by signatories and nonsignatories to the arbitration agreement.

*Third*, even though Plaintiffs are not signatories to the relevant arbitration agreements, their affiliates are, and they are equitably estopped from avoiding those agreements because their complaint seeks to enforce the rights and obligations created by the underlying contracts and because Plaintiffs have benefited directly from those contracts.

### A.    Plaintiffs' Claims Are Arbitrable "Disputes" Within the Meaning of Article 23 of the JVA

The FAA codifies "a strong federal policy favoring arbitration as an alternative means of dispute resolution."[46]  Moreover, as the Second Circuit has frequently stated, "[t]he federal policy favoring the liberal enforcement of arbitration clauses . . . applies with particular force in international disputes.'"[47]  Therefore, courts must "rigorously enforce agreements to

---

[45] *See* Annex A.

[46] *JLM Indus., Inc. v. Stolt-Nielsen SA*, 387 F.3d 163, 171 (2d Cir. 2004) (quoting *Hartford Accident & Indem. Co. v. Swiss Reinsurance Am. Corp.*, 246 F.3d 219, 226 (2d Cir. 2001)).

[47] *Id.* (quoting *Paramedics Electromedicina Comercial, Ltda. v. GE Med. Sys. Info. Techs., Inc.*, 369 F.3d 645, 654 (2d Cir. 2004)); *see also Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 629–31 (1985).

arbitrate,"[48] and "any doubt concerning the scope of arbitrable issues should be resolved in favor of arbitration."[49]

The Second Circuit has held that broad arbitration language, such as the language in the arbitration agreements relevant to this dispute, requires arbitration when the "allegations underlying the claims 'touch matters' covered by the parties'. . . agreements . . ., whatever the legal labels attached to them."[50]  Indeed, "the existence of a broad agreement to arbitrate creates a presumption of arbitrability which is only overcome if it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that [it] covers the asserted dispute."[51]  In determining whether a particular claim falls within the scope of the parties' arbitration agreement, courts "focus on the factual allegations in the complaint rather than the legal causes of action asserted."[52]  The intent of such focus is to prevent plaintiffs from avoiding arbitration merely through creative pleading.[53]

---

[48] *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 221 (1985),

[49] *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983).

[50] *Genesco, Inc. v. T. Kakiuchi & Co., Ltd.*, 815 F.2d 840, 846 (2d Cir. 1987) (quoting *Mitsubishi Motors*, 473 U.S. at 624–25 n.13); *see also Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 720–21 (9th Cir. 1999) (finding arbitration clause that covered disputes "arising in connection with" an agreement encompassed federal statutory claims, defamation claims, and claims of trade secret misappropriation); *Penzoil Exploration & Prod. Co. v. Ramco Energy Ltd.*, 139 F.3d 1061, 1067 (5th Cir. 1998) (broadly-worded arbitration clauses "embrace all disputes between the parties having a significant relationship to the contract regardless of the label attached to the dispute"); *J.J. Ryan & Sons, Inc. v. Rhone Poulenc Textile, S.A.*, 863 F.2d 315, 321 (4th Cir. 1988) (holding that a broad arbitration clause is not limited to the literal interpretation or performance of the contract, but embraces every dispute between the parties having a significant relationship to the contract).

[51] *WorldCrisa Corp. v. Armstrong*, 129 F.3d 71, 74 (2d Cir. 1997) (citation omitted).

[52] *Genesco*, 815 F.2d at 846.

[53] *See, e.g., JLM Indus.*, 387 F.3d at 171–77 (holding that a broad arbitration clause extended to statutory antitrust claims); *Sunkist Soft Drinks, Inc. v. Sunkist Growers, Inc.*, 10 F.3d 753, 758 (11th Cir. 1993) ("It is well established that a party may not avoid broad language in an arbitration clause by attempting to cast its complaint in tort rather than contract.") (citation omitted); *Acevedo Maldonado v. PPG Indus., Inc.*, 514 F.2d 614, 616 (1st Cir. 1975) ("[b]road language [in an arbitration agreement] covers contract-generated or contract-related disputes between the parties however labeled: it is immaterial whether claims are in contract or in tort").

Plaintiffs' efforts to distance their claims from the joint-venture agreements fail. Plaintiffs' factual allegations not only "touch matters" related to the JVA and its ancillary agreement, they rest firmly on those agreements. For example, Plaintiffs allege:

- "Defendant Rhodia obtained unlawful access to the Trade Secrets through a joint venture between affiliates of INVISTA and Rhodia . . . . The parties to the joint venture signed strict confidentiality agreements agreeing to use the Trade Secrets only in operating the joint venture plant and not for any other purpose. Rhodia's employees, who were seconded to work at the joint venture, were bound by duties of loyalty and confidentiality and could not lawfully transfer the technology to Rhodia."[54]

- "Rhodia obtained the Trade Secrets in part from its own employees (and from employees of other companies within the Rhodia Group), or those of their predecessors-in-interest, who worked at or on behalf of Butachimie and who attended technical exchange meetings in the United States. Rhodia also learned the Trade Secrets from confidential documents misappropriated from the Butachimie joint venture. These employees owed duties of loyalty and confidentiality and were precluded from sharing the Trade Secrets they learned while at Butachimie or during technical exchange sessions for any purpose other than for the sole use and benefit of the Butachimie joint venture."[55]

The "strict confidentiality agreements" referenced in Plaintiffs' Complaint are the joint venture agreements described above and set forth in Annex A. As shown, each of those agreements contains a valid and binding arbitration clause that is broad enough to capture breaches of contract, business torts, and statutory claims.

Plaintiffs' causes of action against Rhodia S.A. are equally tied to the JVA and its ancillary agreements:

*(1) Unfair Competition – Lanham Act § 44.* The Complaint expressly ties this claim to Rhodia S.A.'s alleged misappropriation of trade secrets:

- "Upon information and belief, Rhodia gained unlawful access to Invista's Trade Secrets by obtaining them from either Butachimie or DuPont . . .. Butachimie and

---

[54] Compl. ¶ 4 (emphasis omitted); *see also id.* ¶¶ 26, 52, 53, 57.

[55] *Id.*. ¶ 110; *see also id.* ¶¶ 127, 165, 167.

16

DuPont both are under a duty to keep the Trade Secrets confidential or limit their use."[56]

- "By engaging in . . . misappropriation and wrongful use of INVISTA's Trade Secrets, Rhodia and DuPont have acted and threaten to continue to act contrary to honest practices in industrial and commercial matters. Defendants' acts constitute unfair competition within the meaning of Section 44(h) of the Lanham Act . . . ."[57]

- "As a result of the misappropriation of INVISTA's Trade Secrets by Defendants and other acts of unfair competition in violation of the Lanham Act and Paris Convention, INVISTA has suffered and will continue to suffer imminent and irreparable harm and damages . . . ."[58]

The confidentiality obligations referenced in this claim arise solely in the JVA and its ancillary agreements. Thus, any claim alleging a breach of such obligations necessarily touches upon those agreements and must be arbitrated.

   (2)   *Breach of § 43 of the Lanham Act.* Plaintiffs allege that Rhodia S.A. breached Section 43 of the Lanham Act by making "statements to a number of current INVISTA ADN customers and potential customers that it has freedom to use the Gen I technology to build and operate a new ADN plant in Asia and that it is a co-holder of the technology."[59] Plaintiffs claim that those statements "are literally false and misleading" and that "[b]y falsely asserting its own rights to the Gen I technology, Rhodia S.A. is unfairly trading on the reputation and prestige of the Gen I technology in the marketplace."[60] That claim is entirely dependent upon whether Rhodia S.A. has freedom to use certain aspects of the Gen I technology—an issue that must (and will) be resolved by arbitration.

---

[56] *Id.* ¶ 94.

[57] *Id.* ¶ 95.

[58] *Id.* ¶ 96.

[59] *Id.* ¶ 100.

[60] *Id.* ¶¶ 101, 102.

(3)    *Misappropriation of Trade Secrets (Rhodia).*  Plaintiffs' misappropriation claim against Rhodia is predicated on four allegations:[61]

- Rhodia "acquir[ed] the Trade Secrets from or through a person or persons who used improper means to acquire them";

- Rhodia "acquir[ed] or procur[ed] the acquisition of the Trade Secrets from a person or persons with a duty to keep them secret";

- Rhodia is "using and disclosing the Trade Secrets to third parties without the express or implied consent of INVISTA"; and

- Rhodia is "using and disclosing the Trade Secrets with knowledge or reason to know that they were acquired improperly."

Each of those allegations relates to Rhodia S.A.'s right to acquire, disclose, and use certain information regarding the production of ADN, and can be resolved only by interpreting the various obligations set forth by the JVA and its ancillary agreements.  As such, Plaintiffs' claim must be arbitrated.

(4)    *Misappropriation of Trade Secrets (DuPont).*  Plaintiffs' misappropriation claim against DuPont is entirely dependent upon an underlying misappropriation by Rhodia S.A.  Indeed, in their allegations against DuPont, Plaintiffs specifically allege:[62]

- Rhodia "acquir[ed] the Trade Secrets from or through a person or persons who used improper means to acquire them";

- Rhodia "acquir[ed] or procur[ed] the acquisition of the Trade Secrets from a person or persons with a duty to keep them secret";

- Rhodia is "using and disclosing the Trade Secrets to third parties without the express or implied consent of Invista"; and

---

[61] *Id.* ¶ 109.

[62] *Id.*

- Rhodia is "using and disclosing the Trade Secrets with knowledge or reason to know that they were acquired improperly."

As pled, each of those allegations relates to Rhodia S.A.'s right to acquire, disclose, and use information relating to the production of ADN at Butachimie, and can be resolved only by interpreting the various obligations set forth by the JVA and its ancillary agreements. The factual predicate underlying this claim must (and will) be arbitrated. At a minimum, therefore, Plaintiffs' misappropriation claim against DuPont should be stayed.

(5) **Unfair Competition.** Plaintiffs' claim is predicated upon "Defendants' unauthorized use of Invista's Trade Secrets in the planning, design, development and construction of an ADN plant in Asia."[63] Plaintiffs allege that such unauthorized use would give Defendants "a unique and unfair advantage in [their] competition [with Invista]."[64] Whether Rhodia S.A.'s use of certain Gen I-related information is "unauthorized" can be resolved only by interpreting the JVA and its ancillary agreements. Thus, because Plaintiffs can prevail on this claim only if Rhodia S.A.'s use of the information at issue is held to be "unauthorized," Plaintiffs' claim is inextricably linked to the JVA and its ancillary agreement and must be arbitrated.

(6) **Conversion.** Plaintiffs allege that Rhodia S.A. has assumed "dominion and control" or has "imminent plans to assume dominion and control" over the "trade secrets" for use in the "planning, development, construction, and operation of an ADN plant."[65] On its face, this claim is dependent upon (a) a determination of Rhodia's rights to use certain Gen I information and (b) a determination that Rhodia, in fact, is using only information that it is contractually entitled to use. Those issues must (and will) be resolved by arbitration.

---

[63] *Id.* ¶ 128.

[64] *Id.*

[65] *Id.* ¶ 167.

(7)    *Civil Conspiracy.* Plaintiffs allege that Rhodia and DuPont have conspired to produce ADN through unlawful means—"namely the misappropriation or conversion of INVISTA's Trade Secrets, and the breach of and tortious interference with DuPont's contractual obligation not to compete against INVISTA."[66] As pled, this claim is linked directly to the JVA and its ancillary agreements. Indeed, Plaintiffs have pled that Rhodia S.A. and DuPont are conspiring to build an ADN plant using misappropriated and converted trade secrets.[67] Thus, the existence of "misappropriated" and "converted" trade secrets is a factual predicate to the alleged conspiracy. Whether the Gen I information being used by Rhodia S.A.'s subsidiaries to design a new ADN plant constitutes misappropriated "trade secrets" depends upon Rhodia S.A.'s contractual right to use that information. That issue must be arbitrated.

Under the circumstances, Plaintiffs' allegations invoke and rely on the legal rights and obligations created by the JVA and its ancillary agreements and challenge conduct that allegedly violates those agreements. The law simply does not allow parties to selectively invoke the benefits of a contract without bearing that contract's burdens. Plaintiffs, therefore, cannot predicate their claims on rights and obligations created by the JVA and its ancillary agreements, while concomitantly seeking to avoid the arbitration clauses found in those agreements.

**B.    Rhodia S.A. May Compel Invista to Arbitrate Its Claims Even Though Rhodia S.A. Is Not a Signatory to the JVA**

It is well settled that "a nonsignatory party may be bound to an arbitration agreement if so dictated by the 'ordinary principles of contract and agency.'"[68] The Second Circuit has expressly "recognized five theories for binding nonsignatories to arbitration

---

[66] *Id.* ¶ 178.

[67] *Id.*

[68] *Thomson-CSF S.A. v. Am. Arbitration Ass'n*, 64 F.3d 773, 776 (2d Cir. 1995).

agreements: (1) incorporation by reference; (2) assumption; (3) agency; (4) veil-piercing/alter ego; and (5) estoppel."[69]  Any one of these theories may serve as a basis for binding the non-signatory to such an agreement.  Here, the two theories that allow Rhodia S.A. to invoke the relevant arbitration agreements are assumption and estoppel.

### 1.    Rhodia S.A. Has Assumed the JVA's Obligations for Purposes of this Proceeding and the Arbitration

Under Second Circuit law, "[i]n the absence of a signature, a party may be bound by an arbitration clause if its subsequent conduct indicates that it is assuming the obligation to arbitrate."[70]  Rhodia S.A.'s conduct unquestionably shows an intent to assume the obligation to arbitrate the legal dispute at the heart of Plaintiffs' Complaint.  *First,* Rhodia S.A. joined and has actively participated in an arbitration started by its subsidiaries to determine the rights of Rhodia group entities to use the Gen I information at issue in this case.  By joining that arbitration, Rhodia S.A. committed itself to abide by any award the tribunal may issue.  Rhodia S.A. did so, in an effort to ensure that all relevant parties were subject to the arbitration and to leave no doubt that the Rhodia group of companies would comply with the tribunal's determination.  *Second,* Rhodia S.A. moved to dismiss or stay in favor of arbitration in response to Invista S.à.r.l's Texas litigation.  *Third,* Rhodia S.A. affirmed to the ICC tribunal and to Judge Crone that that it would be bound to any award issued by the tribunal.

Rhodia S.A.'s actions clearly show its intent to assume the obligation to arbitrate disputes under the JVA and its ancillary agreements.[71]  Nevertheless, to avoid any confusion, Rhodia S.A. hereby reaffirms its intent to be bound by the decision of the tribunal regarding its

---

[69] *Id.*

[70] *Thomson-CSF,* 64 F.3d at 777; *cf. Bishop v. Smith Barney, Inc.,* No. 97 CV 4807, 1998 WL 50210 (S.D.N.Y. Feb. 6, 1998) (finding nonsignatory had assumed the obligation to arbitrate by initiating a prior arbitration under the agreement).

[71] *See Invista N. Am.,* 503 F. Supp. 2d at 203.

right, and the right of its subsidiaries, to use Gen I-related information in the planning, design, construction, and operation of a potential new ADN plant anywhere in the world. Under the standard set out by the Second Circuit, Rhodia S.A.'s conduct is more than sufficient to assume the relevant arbitration agreements.

### 2. Rhodia S.A. May Equitably Invoke the JVA's Arbitration Clause

Even if the Court finds that Rhodia S.A. has not assumed the obligation to arbitrate, Rhodia S.A. is entitled to invoke the relevant arbitration agreements on the ground of equitable estoppel. The Second Circuit has held that a nonsignatory may invoke the doctrine of estoppel to compel a party to arbitrate a dispute "where a careful review of 'the relationship among the parties, the contracts they signed . . ., and the issues that had arisen' among them discloses that 'the issues the nonsignatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed."[72] The Second Circuit has described this doctrine as the "alternative estoppel theory."[73]

Although in *Choctaw*, a non-signatory defendant was seeking to compel a signatory plaintiff to arbitrate, the Second Circuit's standard does not foreclose the possibility that a non-signatory defendant can invoke an arbitration agreement against a non-signatory plaintiff when the general standard is met, particularly when, as is the case here, closely related affiliates on both sides are parties to the arbitration agreement. Rather, in cases involving a non-signatory defendant and a non-signatory plaintiff, the Court must simply apply a two-part test to determine whether arbitration can be compelled on the basis of equitable estoppel: (a) is the non-signatory defendant equitably entitled to invoke the arbitration agreement; and (b) can the non-

---

[72] *JLM Indus.*, 387 F.3d at 177 (quoting *Choctaw Generation L.P. v. Am. Home Assurance Co.*, 271 F.3d 403, 406 (2d Cir. 2001)) (emphasis added).

[73] *See Thomson-CSF*, 64 F.3d at 779 (noting that "[s]everal courts of appeal have recognized an alternative estoppel theory requiring arbitration between a signatory and nonsignatory").

signatory plaintiff be bound to the arbitration agreement. If the answer to both questions is yes,
the fundamental notions of fairness underlying the doctrine of equitable estoppel dictate that the
matter should be dismissed in favor of arbitration.

The *Choctaw* standard requires the issues pled in a complaint to be "intertwined"
with the agreement containing the relevant arbitration clause. The Second Circuit has never
"specif[ied] the minimum quantum of 'intertwined-ness' required to support a finding of
estoppel," instead favoring a case-by-case approach.[74] This Court, however, has articulated a
two-part test to determine whether the issues in the litigation are sufficiently intertwined with the
underlying arbitration agreement to permit the application of equitable estoppel: (1) whether a
close relationship exists between the signatory and non-signatory; and (2) whether the claims in
litigation are intertwined with the subject matter of the agreements containing the relevant
arbitration provisions.[75] Both of those standards are satisfied in this case.

*First*, Rhodianyl (the signatory) is a wholly-owned subsidiary of Rhodia S.A.
and, thus, the relationship between the parties is extremely close. In addition, Plaintiffs treat
Rhodia S.A. and its subsidiaries as a single entity, alleging that "Defendant Rhodia is the
management entity that controls, directly or indirectly, all of the other entities in the Rhodia
Group."[76] Plaintiffs further allege that Rhodia S.A. employees "were bound by duties of loyalty
and confidentiality and could not lawfully transfer the technology [in dispute] to Rhodia for its
own use in building a new plant in Asia or elsewhere,"[77] and that "Rhodia [S.A.] obtained the

---

[74] *JLM Indus.*, 387 F.3d at 178 (citation omitted).

[75] *See Massen v. Cliff*, No. 02 CV 9282, 2003 WL 2012404, at *4 (S.D.N.Y. May 1, 2003) (citing *Chase Mortgage Co.-West v. Bankers Trust Co.*, No. 00 CV 8150, 2001 WL 547224, at *2–*3 (S.D.N.Y. May 23, 2001)); *see also Camferdam v. Ernst & Young Int'l, Inc.*, No. 02 CV 10100, 2004 WL 307292, at *6 (S.D.N.Y. Feb. 13, 2004).

[76] Compl. ¶ 23.

[77] *Id.* ¶ 4; *see also id.* ¶¶ 52, 110.

Trade Secrets in part from its own employees (and from employees of other companies

[working] within the Rhodia Group), or those of their predecessors-in-interest, who worked at or

on behalf of Butachimie and . . . attended technical exchange meetings in the United States."[78]

As Plaintiffs are aware, the "Rhodia" employees to which they refer are employees of Rhodia

Opérations – a wholly owned subsidary of Rhodianyl and the assignee of certain of the ancillary

agreements containing the relevant arbitration clauses.  In addition, the "predecessors-in-interest"

to which Plaintiffs refer includes SUCRP, the original signatory to the JVA and its ancillary

agreements.  Thus, on its face, Plaintiffs' complaint alleges concerted misconduct by Rhodia

S.A. and the signatories to the JVA and its ancillary agreements, and is sufficient to justify

applying equitable estoppel.[79]

      *Second*, Plaintiffs' claims are "intertwined" with the subject matter of the

agreements containing the relevant arbitration provisions.[80]  Although no bright line rule applies

to this determination, the Second Circuit has held that claims are "intertwined" with an

---

[78] *Id.* ¶ 110; *see also* ¶¶ 52, 57.  For the record, Rhodia denies these allegations; but the focus of this inquiry is upon the Plaintiffs' allegations.

[79] *Smith/Enron Cogeneration*, 198 F.3d at 98 ((estopping a party from "shield itself from arbitration by arguing that only . . . the parties [it] intentionally did not sue . . . would have the right to invoke" the arbitration agreement because of the nature of the allegations in its complaint); *accord Denney v. BDO Seidman LLP*, 412 F.3d 58, 70 (2d Cir. 2005) ("Having alleged . . . that the . . . defendants acted in concert to defraud plaintiffs, . . . plaintiffs cannot now escape the consequences of those allegations by arguing that the . . . defendants lack the requisite close relationship . . . ."); *Astra Oil Co. v. Rover Navigation, Ltd.*, 344 F.3d 276, 279–80 (2d Cir. 2003) ("[I]n *Smith/Enron [Cogeneration]*, we held that where the [signatory] had treated affiliated companies . . . as a single entity in filing claims against [the nonsignatory] . . ., the defendant was estopped from resisting arbitration."); *Carroll v. LeBoeuf, Lamb, Greene & MacRae LLP*, 374 F. Supp. 2d 375, 378 (S.D.N.Y. 2005) ("Having elected to tar [the nonsignatories] with the very broad brush that they applied to other [signatory] defendants, plaintiffs' attempt to avoid arbitration by pointing to their distinctness is unpersuasive."); *see also Vaughn v. Leeds, Morelli & Brown, P.C.*, No. 04 CV 8391, 2005 WL 1949468, at *4–*5 (S.D.N.Y. 2005) (stating that allegations of concerted misconduct among signatories and nonsignatories establish a close relationship).

[80] *See Massen*, 2003 WL 2012404, at *4.

arbitration agreement when the claims presume the existence of the written agreement.[81]  Indeed,

"[t]he plaintiff's *actual dependence* on the underlying contract in making out the claim against

the nonsignatory defendant is . . . always the *sine qua non* of an appropriate situation for

applying equitable estoppel."[82]

REDACTED

| Complaint | Arbitration Counterclaim[83] |
|---|---|
| Entry of a preliminary and permanent injunction . . . (4) enjoining Rhodia and those in concert or participation with it, from using or disclosing, or causing anyone to use or disclose, the Trade Secrets other than in connection with the Butachimie joint venture; (5) requiring Rhodia and DuPont, and each of their agents, servants, employees, attorneys, and all others in active concert or participation with them, to turn over to INVISTA any and all documents and information (in whatever form, including information in writing or electronically) that incorporate, in whole or in part, INVISTA's Trade Secrets or other proprietary technical or business information, and prohibiting Rhodia from retaining any such information in any form . . . (Comp. | REDACTED |

---

[81] *See JLM Indus.*, 387 F.3d at 178; *accord Choctaw Generation Ltd. P'Ship*, 271 F.3d at 407 (finding that "the controversy . . . is linked textually to the [agreement], and its merits are bound up with the dispute now being arbitrated").

[82] *Birmingham Assocs. Ltd. v. Abbott Labs.*, 547 F. Supp. 2d 295, 301 (S.D.N.Y. 2008) (quoting *Miron v. BDO Seidman LLP*, 342 F. Supp. 2d 324, 333 (E.D. Pa. 2004)) (emphasis original); *see also Flightdocs, Inc. v. Jackson*, No. 04 CV 4840, 2005 WL 2038588, at *6 (E.D.N.Y. Aug. 23, 2005) (finding a claim for tortious interference intertwined with the underlying agreement, because the elements of the claim require a finding that a contract existed and that the contract was actually breached); *Thixomat, Inc. v. Takata Physics Int'l Co., Ltd.*, No. 01 CV 5449, 2001 WL 863566, at *3 (S.D.N.Y. July 30, 2001) (finding signatory's counterclaim intimately intertwined with arbitration regarding the wrongful transfer of trade secrets)

[83] Greenblatt Decl., Ex. J.

p. 40.)



Under the circumstances, Rhodia S.A. should be permitted to invoke the relevant arbitration clauses and require Plaintiffs to prosecute their claims before an ICC tribunal.

### C.    Invista May Not Avoid the Obligation to Arbitrate Under the JVA

"The linchpin for equitable estoppel is equity-fairness."[84]  Here, in light of Plaintiffs' reliance on the joint venture agreements to state their claims, fairness unquestionably dictates the application of equitable estoppel to prevent Plaintiffs from avoiding their obligation to arbitrate.  Plaintiffs simply "cannot have it both ways.  They cannot rely on the contract when it works to their advantage by enforcing the obligations of the . . . defendants, but then repudiate the contract and its arbitration clause when they believe it works against them."[85]  This is particularly the case, where, as here, Plaintiffs are affiliates of the parties to the JVA agreements.

In addition to Plaintiffs' reliance, however, there is a second ground on which to bind Plaintiffs to the relevant arbitration agreements.  Under Second Circuit law, a plaintiff that

---

[84] *Grigson v. Creative Artists Agency LLC*, 210 F.3d 524, 528 (5th Cir. 2000).

[85] *Fluor Daniel Intercontinental, Inc. v. Gen. Elec. Co.*, No. 98 CV 7181, 1999 WL 637236, at *7 (S.D.N.Y. Aug. 20, 1999).

knowingly exploits a contract containing an arbitration agreement can be estopped from avoiding arbitration even though the plaintiff did not sign that agreement.[86]  The Second Circuit held that, "ordinary principles of contract and agency" dictate that a party should be estopped from avoiding arbitration when it has "knowingly accepted the benefit of an agreement with an arbitration clause."[87]

Plaintiffs have directly benefited from the joint venture agreements described above.  Although KoSa France is the signatory to the relevant agreements, Plaintiffs are the owners of the technology and, thus, are the direct beneficiaries of the revenues, market position, and reputational benefits that they claim from possessing such technology.[88]  Indeed, Plaintiffs claim that "technology at issue is INVISTA's [*i.e.*, Plaintiffs] proprietary, butadiene-based ADN technology, which constitutes trade secrets of enormous value."[89]  Plaintiffs characterize that technology as "core technology" acquired "as part of a $4 billion transaction"[90]  Plaintiffs' continued development of such technology purportedly has given them "a significant competitive advantage in the global marketplace."[91]  Plaintiffs further benefit from the joint venture agreements because they permit Plaintiffs to "control the dissemination of [their] confidential information."[92]  Thus, the JVA and its ancillary agreements provide direct benefits to Plaintiffs in their capacity as owners of the technology covered by those agreements.  .

---

[86] *MAG Portfolio Consult GMBH v. Merlin Biomed Group LLC*, 268 F.3d 58, 61 (2d Cir. 2001).

[87] *Id.*

[88] *See, e.g.*, Declaration of Benjamin Herzog, dated September 8, 2008 (hereinafter "Herzog Decl.")

[89] Compl. ¶ 1.

[90] *Id.*

[91] *Id.* ¶ 3; *see also* Herzog Decl. ¶ 27 ("it is INVISTA's proprietary butadeine-based technology that is the primary source of INVISTA's competitive advantage over its competitors in the Nylon 6,6 manufacturing chain, and a key linchpin to its overall success and leadership in the industry.").

[92] Herzog Decl. ¶ 17.

The fact that the joint venture agreements directly benefit Plaintiffs is also shown in their claims of harm. For example, in support of Plaintiffs' Motion for Temporary Injunction, Benjamin Herzog, INVISTA's Vice President of Strategy and Market Analysis for Intermediates, stated that Rhodia S.A.'s disclosure of Plaintiffs' trade secrets would harm Plaintiffs in a variety of ways.[93] Indeed, Mr. Herzog claimed that Rhodia S.A.'s misuse of such information could interfere with Plaintiffs' relationships with its customers and supplier, and potentially exclude Plaintiffs from the Asian market.[94]

Such claims could not be made if the benefits Plaintiffs derived from the joint venture agreements were derivative or ancillary. Rather, as pled, the value and benefits that Plaintiffs acquire from the technology at issue flow directly from their ability to maintain exclusive control over that technology—an ability that is dependent upon Plaintiffs' ability to enforce the confidentiality provisions in the joint venture agreements referenced above.[95] Under Second Circuit law, Plaintiffs therefore cannot avoid the obligation to arbitrate found in each of those agreements.[96]

## II.    ALTERNATIVELY, THIS COURT SHOULD STAY THIS ACTION IN FAVOR OF THE PENDING ICC ARBITRATION

Even if the Court determines that dismissal of this action is not appropriate, this case should be stayed either pursuant to the mandatory stay provision of 9 U.S.C. § 3 or the court's inherent authority to manage its own docket. Regardless of how the Court rules on

---

[93] *Id.* ¶¶ 17-28.

[94] *See id.*

[95] Direct benefits are those "flowing directly from the agreement," *Mag Portfolio Consult*, 268 F.3d at 61.

[96] *See Deloitte Noraudit A/S v. Deloitte Haskins & Sells, U.S.*, 9 F.3d 1060, 1064 (2d Cir. 1993); *see also Am. Bureau of Shipping v. Tencara Shipyard S.P.A.*, 170 F.3d 349, 353 (2d Cir. 1999) (finding that a nonsignatory owner of a ship had received direct benefits from an agreement between the shipbuilder and classification association regarding classification of the ship as seaworthy); *Best Concrete Mix Corp. v. Lloyd's of London Underwriters*, 413 F. Supp. 2d 182, 187 (E.D.N.Y. 2006) (nonsignatory estopped from avoiding arbitration where the nonsignatory sought to enforce rights created under the agreement).

Rhodia S.A.'s and DuPont's jurisdictional motions, the ICC Arbitration will proceed. The factual question underlying Plaintiffs' claims, therefore, will be resolved in the ICC Arbitration.

Allowing this action to proceed in parallel could have several harmful consequences. *First*, given the overlapping nature of the claims and Plaintiffs' desire to avoid arbitration, it is highly likely that Plaintiffs would do everything in their power to delay the arbitration in favor of this proceeding. Such delay would unreasonably prejudice Rhodianyl's right (as the signatory to the agreements) to arbitrate disputes arising in connection with the JVA and its ancillary agreements.

*Second*, the tribunal has set a fast-track schedule for the ICC Arbitration, with merits hearings to be held in June 2009. In light of the significant pre-answer motion practice, contemplated discovery, and complex merits issues involved in this litigation, it is highly unlikely that the Court would be able to resolve this matter on a faster schedule. By staying these proceedings, however, the Court would ensure the timely resolution of the underlying dispute.

*Third,* allowing this case to proceed in parallel with the arbitration would create a significant risk of conflicting judgments. For example, Plaintiffs are seeking injunctive relief in this Court and the Invista Respondents are seeking similar relief in the ICC Arbitration. Rhodia S.A. would be placed in an untenable position if one forum were to deny injunctive relief and one forum were to grant such relief. The federal policy and the broad language in Section 3 of the FAA are designed to avoid such situations.

*Fourth*, permitting this case to proceed would reward Plaintiffs for their forum shopping and efforts to distort the proper parties to this dispute. The Second Circuit has clearly held that a

29

stay is particularly appropriate where a plaintiff has manipulated the parties to the litigation to avoid arbitration:

> [W]here a party to an arbitration agreement attempts to avoid that agreement by suing a related party with which it has no arbitration agreement in the hope that the claim will be adjudicated first and have preclusive effect in the arbitration, "[s]uch a maneuver should not be allowed to succeed, [and] . . . is blocked . . . by the principles of parallel-proceeding abstention, which . . . require the court to stay the proceedings before it and let the arbitration go forward unimpeded."[97]

That principle applies doubly in this case because Plaintiffs have not only sued Rhodia S.A., rather than the Rhodia entities that signed the JVA agreements, in an effort to avoid arbitration they have purposely not named KoSa France – the party to whom the obligations under the JVA and the ancillary agreements are owed. Indeed, they have done it twice – first in Texas and now again in New York. In light of these concerns, the Court should enter either a mandatory or discretionary stay.

### A.     This Court Should Stay This Action Under Section 3 of the FAA

The FAA requires that matters "brought in any of the courts of the United States upon any issue referable to arbitration" be stayed pending the outcome of the arbitration.[98]  That requirement is absolute and does not afford courts any discretion.[99]

In assessing whether an issue is "referable to arbitration," the Court must determine: (a) whether the parties agreed to arbitrate and, if so, the scope of that agreement; (b) if federal statutory claims are asserted, whether Congress intended those claims to be

---

[97] *WorldCrisa Corp.*, 129 F.3d at 76 (quoting *IDS Life Ins. Co. v. SunAmerica, Inc.*, 103 F.3d 524, 530 (7th Cir. 1996).

[98] 9 U.S.C. § 3. Section 3 applies to foreign arbitration agreements by virtue of Section 208 of the Act. *See* 9 U.S.C. § 208.

[99] *See WorldCrisa Corp.*, 129 F.3d at 74 (stating that a district court "must stay proceedings if satisfied that the parties have agreed in writing to arbitrate an issue or issues underlying the district court proceeding").

nonarbitrable; and (c) if some but not all, of the claims in the case are arbitrable, whether to stay the balance of the proceedings pending arbitration.[100]

   *First*, Rhodia S.A. has clearly demonstrated that the doctrines of assumption and equitable estoppel allow it to invoke the relevant arbitration agreements against Plaintiffs, bind Plaintiffs to the duty to arbitrate or estop them from denying it, and that Plaintiffs' allegations fall within the scope of those agreements. Nevertheless, Plaintiffs surely will argue that no written arbitration agreement exists between the parties to this litigation and, as such, no stay can be granted under Section 3 of the FAA. The Second Circuit, however, has held that the writing requirement in Section 3 of the FAA is satisfied where a nonsignatory relies on the doctrine of equitable estoppel as the basis for invoking an arbitration agreement by the doctrine of estoppel.[101] According to the court, such a holding was necessary for three reasons. *First,* "to hold otherwise would depart from the language and policies of the FAA and quite possibly lead to perverse and unnecessary complexities in cases involving arbitration agreements."[102] *Second,* a contrary holding may preclude courts from staying proceedings under Section 3 of the FAA "where principles of equitable estoppel bind parties to arbitrate under an arbitration agreement"—an outcome the Second Circuit found to be unacceptable.[103] *Third,* "to hold the writing requirement unfulfilled would be contrary to the caselaw in this and several other circuits, where courts have frequently stayed proceedings and compelled arbitration under the

---

[100] *Oldroyd v. Elmira Savings Bank, FSB*, 134 F.3d 72, 75–76 (2d Cir. 1998) (citing *Genesco*, 815 F.2d at 844).

[101] *Ross v. Am. Express Co.*, 478 F.3d 96, 98–99 (2d Cir. 2007) (finding jurisdiction pursuant to Section 16 of the Act over an appeal of a denial of a motion to compel arbitration by a nonsignatory).

[102] *Id.* at 99.

[103] *Id.*

FAA on equitable estoppel grounds."[104] Thus, the Second Circuit has contemplated the scenario

before the Court and found that the Court may grant a motion to stay under Section 3 of the FAA

that is based on equitable estoppel if, as is the case here, the issues are "referable to

arbitration."[105]

       *Second*, for reasons stated in Rhodia S.A.'s Motion to Dismiss for Lack of

Subject Matter Jurisdiction, Plaintiffs' Lanham Act claims fail as a matter of law. However,

even if those claims are properly stated, their presence does not preclude a dismissal or stay in

favor of arbitration because it is well settled that Lanham Act claims may be arbitrated.[106]

Plaintiffs, therefore, could prosecute their Lanham Act claims in the ICC Arbitration.

       *Third*, Plaintiffs' causes of action are ripe for dismissal or stay. "The decision to

stay the balance of the proceedings pending arbitration is a matter largely within the district

court's discretion to control its docket."[107] It is appropriate to exercise that discretion when

"arbitrable claims predominate the lawsuit and the nonarbitrable claims are of questionable

merit."[108] Here, almost all of Plaintiffs' claims are clearly arbitrable. To the extent that a small

number of claims may not be arbitrable—*e.g.*, allegations that DuPont breached the PSA and

PTIA—it would be entirely appropriate to stay those claims pending the outcome of the

arbitration. To do so would preserve judicial economy, and would permit the arbitration to make

---

[104] *Id.* at 100 (*citing JLM Indus.*, 387 F.3d at 177); *Astra Oil Co.*, 344 F.3d 276; *Smith/Enron Cogeneration L.P. Inc.*, 198 F.3d 88.

[105] 9 U.S.C. § 3.

[106] *See, e.g., Simula Inc.*, 175 F.3d at 724 ("Court have routinely found that Lanham Act claims are arbitrable"); *Doctor's Assocs. Inc. v. Distajo*, 107 F.3d 126, 133 (2d Cir. 1997); *Gingiss Int'l Inc. v. Bormet*, 58 F.3d 328, 332 (7th Cir. 1995) (finding that a broad arbitration clause which required "all disputes and claims relating to any provision" of a franchise agreement conferred jurisdiction on an arbitrator to resolve Lanham Act claims); *Gidatex S.R.L. v. Campaniello Imports, Ltd.*, 13 F. Supp. 2d 420, 426–27 n.2 (S.D.N.Y. 1998).

[107] *Genesco*, 815 F.2d at 856.

[108] *Id.*

factual findings and conclusions of law that could have a direct bearing on the resolution of those claims.

**B.    This Court Should Stay This Action Pursuant to Its Inherent Powers**

All four factors governing whether the Court should stay this case under Section 3 of the FAA dictate that a mandatory stay should be entered. If, however, the Court finds that a mandatory stay is not appropriate, it should nonetheless stay this action under its inherent authority to manage its own docket.[109]

To determine whether a discretionary stay is appropriate, the Court must decide if "there are issues common to the arbitration and the court, and that those issues will finally be determined by arbitration."[110] Additional factors are whether the grant of a stay would hinder the arbitration, whether the arbitration will be resolved within a reasonable time, and whether any delay that may occur would cause undue hardship to the nonmoving party.[111] Again, all of the factors point in favor of granting a stay.

Rhodia S.A. has demonstrated above how almost all of Plaintiffs' claims are inseparable from the issues in the ICC Arbitration. By staying this case, the Court would allow those issues to be resolved. Also, as shown above, there is significant risk that parallel proceedings could deprive Rhodianyl of its contractual right to arbitrate this dispute, result in inconsistent judgments, and materially disrupt the timetable set by the ICC tribunal. Taken together, these factors clearly weigh in favor of staying this case until entry of a final award in the ICC Arbitration.

---

[109] *See Orange Chicken L.L.C. v. Nambe Mills, Inc.*, No. 00 CV 4730, 2000 WL 1858556 (S.D.N.Y. Dec. 19, 2000).

[110] *Birmingham Assocs.*, 547 F. Supp. 2d at 302 (quoting *Am. Shipping Line, Inc. v. Massan Shipping Indus., Inc.*, 885 F. Supp. 499, 502 (S.D.N.Y. 1995)).

[111] *See id.*

## CONCLUSION

The lynchpin of equity is fairness. For the reasons stated above, fairness requires that this case be dismissed or stayed in favor of arbitration. Rhodia S.A., therefore, respectfully requests that the Court dismiss Plaintiffs' complaint in favor of arbitration. Alternatively, Rhodia S.A. respectfully requests that the Court stay these proceedings until entry of a final award in the pending ICC Arbitration.

Dated:     New York, New York
           September 22, 2008

SHEARMAN & STERLING LLP

By: _____
Jonathan L. Greenblatt
Henry Weisburg
Neil H. Koslowe
Christopher M. Ryan

599 Lexington Avenue
New York, NY 10022-6069
Telephone: (212) 848-4000
Facsimile: (212) 848-7179
jgreenblatt@shearman.com

Attorneys for Defendant
Rhodia S.A.

34

*Invista S.a r.l., et al v. E.I. Du Pont de Nemours and Company and Rhodia S.A.*, No. 08-CIV-7270

## ANNEX A

| Agreement | Parties | Confidentiality Provision | Arbitration Provision | Choice of Law |
|---|---|---|---|---|
| *Joint Venture Agreement[1]* | SUCRP<br><br>DuPont France | Neither party will disclose to third parties or use, except as otherwise agreed upon, for fifteen (15) years from the date of disclosure, confidential information with respect to the production of ADN or ADN hydrogenation disclosed to it by the other party or by SNC, except for such information that (a) is or becomes publicly known through sources entitled to disclose the same; (b) is known at the time of its receipt as shown by the recipient's prior written records; or (c) is disclosed to the recipient by a third party entitled to disclose the same.<br><br>However, DuPont France may disclose to DuPont confidential information with respect to the production of ADN which information DuPont has agreed to keep confidential for the same period of time that DuPont France is obligated to keep the information confidential. This obligation of DuPont shall not apply to confidential information that is disclosed to DuPont by a third party entitled to disclose the same or is known to DuPont at the time of receipt thereof as is shown by DuPont's prior written records. | The parties hereto agree that all disputes which may arise in connection with this agreement should be resolved between them and, when this is not possible, such disputes shall be finally settled under the Rules of Conciliation and Arbitration of the International Chamber of Commerce by one or more arbitrators appointed in accordance with said Rules, arbitration to be held at Paris, France. The arbitrators will act as *amiable compositeurs*. The decision of the arbitrators will be final. Enforcement of the award can be requested by either party through application to any court having jurisdiction. This arbitration clause shall not apply to those Exhibits which contain their own arbitration clauses. | France |

A1

---

[1] Greenblatt Decl., Ex. A art. 9 ("Nondisclosure of Technology"); *id.* art. 23 ("Arbitration"); *id.* art. 26 ("Applicable Law").

| *License Agreement* (JVA, Ex. C)[2] | DuPont Butachimie | (c) Except as hereinbefore specifically provided, neither Licensee nor any Sublicensee shall disclose any Confidential DuPont Technical Information to any party, furnish to any party any equipment embodying any such information or use said information in any manufacturing operations outside of France.  The obligations of this paragraph shall continue for fifteen (15) years from the date of receipt by Licensee of the particular Confidential DuPont Technical Information in question.<br><br>(d) Should any Sublicensee or any other party or person acquiring Confidential DuPont Technical Information from Licensee or any Sublicensee disclose any Confidential DuPont Technical Information or use it for any purpose except as specifically authorized by this Agreement before the fifteen (15th) anniversary of the date of receipt by Licensee of the particular Confidential DuPont Technical Information in question, then in that event Licensee shall be liable to DuPont for any and all damages to DuPont directly resulting from such unauthorized disclosure or use. | All disputes, other than those concerning the determination of whether a deviation referred to in Article II is directly the result of faulty or inadequate DuPont Technical Information, arising in connection with this Agreement shall be finally settled under the Rules of Conciliation and Arbitration of the International Chamber of Commerce by three arbitrators appointed in accordance with said rules, arbitration to be held at Paris, France.  The decision of the arbitrators will be final.  Enforcement of the award can be requested by either party through application to any court having jurisdiction. | France |

A2

---

[2] Greenblatt Decl., Ex. B art. III ("Technical Information Rights"); *id.* art. XVII ("Arbitration"); *id.* art. XIV ("Assignment – Applicable Law").

| *Secrecy and Ownership of Inventions Agreement* (JVA, Ex. D)[3] | Butachimie<br><br>SUCRP<br><br>DuPont France | During the period ending fifteen (15) years from the date of receipt of Confidential Technical Information, the receiving party shall not disclose or use the Confidential Information for any purpose other than as authorized in writing by [Butachimie]; provided, however, that nothing in this paragraph shall prevent DuPont France from disclosing Confidential Technical Information to its parent company, DuPont. | All disputes arising in connection with this Agreement should be resolved between the parties and when that is not possible shall be finally settled under the Rules of Conciliation and Arbitration of the International Chamber of Commerce by three arbitrators appointed in accordance with said rules, arbitration to be held at Paris, France. The decision of the arbitrators will be final. Enforcement of the award can be requested by either party through application to any court having jurisdiction. | France |

---

[3] Greenblatt Decl., Ex. C art. I; *id.* art. VI; *id.* art. V.

A3

| | | | None |
|---|---|---|---|
| *Engineering and Technical Services Agreement* (JVA, Ex. F)[4] | Butachimie<br><br>SUCRP<br><br>DuPont France | During a period of fifteen (15) years from the date of receipt by SUCRP of the Confidential Technical Information by virtue of paragraph (a) above, SUCRP promises to utilize said Confidential Technical Information for no other purpose than those of this contract and of the other contracts relative to the activities of SNC; moreover, SUCRP will take all the necessary measures to avoid divulgence without prior authorization of SNC of the Confidential Technical Information in question except to Contractors or to third parties involved in the realization of the Installations, under reservation that said Contractors or third parties have signed obligations of secrecy and of restrictions of use at least equivalent to those of this contract and under the supplemental reservation that SNC has given its approval to the contents of the Confidential Technical Information communicated in each case. | All disputes arising in connection with this Agreement should be resolved between the parties and when that is not possible shall be finally settled under the Rules of Conciliation and Arbitration of the International Chamber of Commerce by three arbitrators appointed in accordance with said rules, arbitration to be held at Paris, France.  The decision of the arbitrators will be final.  Enforcement of the award can be requested by either party through application to any court having jurisdiction. |

---

[4] Greenblatt Decl., Ex. D art. VII; *id.* art. XI.

A4

| | | NO CONFIDENTIALITY PROVISION | | |
|---|---|---|---|---|
| *Operating Agreement* (JVA, Ex. G)[5] | Butachimie<br><br>SUCRP | | The parties hereto agree that all disputes arising in connection with this Agreement should be resolved between the parties and when that is not possible shall be finally settled under the Rules of Conciliation and Arbitration of the International Chamber of Commerce by three arbitrators appointed in accordance with said rules, arbitration to be held at Paris, France. The decision of the arbitrators will be final. Enforcement of the award can be requested by either party through application to any court having jurisdiction. | None |
| *Secrecy and Technical Support Services Agreement* (Replacement to JVA, Ex. D)[6] | Butachimie<br><br>DuPont<br><br>DuPont France<br><br>Rhone-Poulenc Chimie<br><br>Rhone-Poulenc Industrialization | Should Butachimie reveal Confidential Technical Information to RPC, DuPont France, or El DuPont in writing, and on that occasion designate this information as confidential, the party receiving such Confidential Technical Information must not disclose it to any third party or use it for any purpose other than that for which Butachimie has given its written authorization, for a period of fifteen (15) years from the date on which it is received. | The parties to these presents agree to resolve among themselves and disputes ensuing from the present contract; when that does not seem to be possible, such disputes will be settled in binding arbitration according to the Rules of Conciliation and Arbitration of the International Chamber of Commerce by three arbitrators appointed in accordance with such Rules. The arbitration will take place in Paris. The arbitration decision will not be subject to appeal. Confirmation of the arbitration decision may be requested from the courts of competent jurisdiction. | France |

---

[5] Greenblatt Decl., Ex. E art. XII ("Arbitration").

[6] Greenblatt Decl., Ex. F art. 1 ("Principles and Confidentiality"); *id.* art. 7 ("Applicable Law – Arbitration").