**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

INVISTA S.à r.l., INVISTA Technologies
S.à r.l. and INVISTA North America S.à r.l.,

Plaintiffs,

v.

E.I. DU PONT DE NEMOURS AND COMPANY
and RHODIA S.A.,

Defendants.

Case No. 08–7270  (BSJ)

---

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS'**
**MOTIONS TO DISMISS FOR LACK OF SUBJECT MATTER**
**JURISDICTION**

QUINN EMANUEL URQUHART
OLIVER & HEDGES, LLP
51 Madison Avenue
New York, New York 10010
Tel.:  (212) 849-7000
Fax:  (212) 849-7100

CURTIS, MALLET-PREVOST
COLT & MOSLE LLP
101 Park Avenue, 35th Floor
New York, New York 10178
Tel.:  (212) 696-6000
Fax:  (212) 697-1559

*Attorneys for INVISTA S.à r.l., INVISTA*
*Technologies S.à r.l. and INVISTA North*
*America S.à r.l.*

## **TABLE OF CONTENTS**

**Page**

I.  INVISTA HAS PLED A VALID LANHAM ACT 43(a) CAUSE OF ACTION ..............8

    **A.**  INVISTA Has Pled A Cognizable Claim For False Advertising Under
43(a)(1)(B) ...................................................................................................9

        **1.**  Section 43(a)(1)(B) Encompasses False Claims of Technology
Ownership .........................................................................................10

        **2.**  Misrepresentations of Fact .................................................................12

        **3.**  Interstate Commerce .........................................................................13

        **4.**  Commercial Advertising or Promotion ...............................................13

        **5.**  Harm To INVISTA .............................................................................14

    **B.**  Rhodia's Arguments Are Unpersuasive ......................................................14

II.  INVISTA HAS PLED A VALID CLAIM UNDER LANHAM ACT SECTION
44 AND THE PARIS CONVENTION .........................................................................16

    **A.**  Section 44 and the Paris Convention Provide A Federal Forum For
INVISTA To Assert State Law Claims .......................................................17

        **1.**  Structure of the Lanham Act and Paris Convention ...................................17

    **B.**  The Case Law ............................................................................................19

    **C.**  The Second Circuit's *Empresa* Decision Does Not Dictate a Different
Result .........................................................................................................23

    **D.**  This Case Does Not Involve An Extraterritorial Application of the
Lanham Act ................................................................................................27

        **1.**  The Lanham Act Claim Against DuPont .................................................27

        **2.**  Lanham Act Claims Against Rhodia .......................................................29

III.  THIS COURT HAS SUPPLEMENTAL JURISDICTION OVER INVISTA'S
STATE LAW CLAIMS ...............................................................................................32

## <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

### <u>CASES</u>

*Ace Novelty Co., Inc. v. Vijuk Equipment, Inc.,*
    No. 90 C 3116., 1990 WL 129510, at *7 (N.D. IL. Aug. 31, 1990).................... 11, 12, 30

*Almacenes Exito S.A. v. El Gallo Meat Market, Inc.*
    381 F.Supp 2d 324, 329 (S.D.N.Y. 2005) ....................................................... 4

*Atl. Richfield Co. v. ARCO Globus Int'l Co.*, 150 F.3d 189, 192 n. 4 (2d Cir.1998) .................. 31

*Bell Atlantic Corp. v. Twombly,*
    127 S.Ct. 1955, 1960 (2007)................................................................ 9

*BP Chemicals Ltd. v. Formosa Chemical & Fibre Corp.,*
    No. 97-C V-4554 (D.N.J. May 14, 1998) ................................................ 23

*BP Chemicals v. Baloun,*
    183 F. Supp. 2d 1158 (E.D. Mo. 2000)................................................ 23, 30

*BP Chemicals, Ltd. v. Formosa Chemical & Fibre Corp.,*
    No. 97-CV-4554, at 24 n.23 (D.N.J. May 14, 1998) ...................................... 24

*Brown v. Bronx Cross County Medical Group,*
    834 F.Supp. 105, 109 (S.D.N.Y.1993)................................................ 34

*Calvin Klein Industries v. BFK Hong Kong, Ltd.,*
    714 F.Supp. 78 (S.D.N.Y.1989)................................................... 33

*Chapdelaine Corporate Secs. & Co. v. Depository Tr. & Clearing Corp.,*
    No. 05 Civ. 10711, 2006 WL 2020950 at *6 n.84 (S.D.N.Y., July 13, 2006)................. 34

*Demetriades v. Kaufmann,*
    698 F. Supp. 521, 524 (S.D.N.Y. 1988)................................................ 14

*Digigan, Inc. v. Ivalidate, Inc.,*
    No. 02 Civ. 420, 2004 WL 203010 at *5 (S.D.N.Y. 2004) ............................... 17

*Dow Jones & Co., Inc. v. Harrods, Ltd.,*
    237 F.Supp.2d 394, 404 (S.D.N.Y. 2002) ............................................. 9

*Empresa Cubana del Tabaco v. Culbro Corp,*
    399 F.3d 462 (2d Cir. 2005)........................................................ 3, 18

*Empresa Cubana del Tabaco v. Culbro Corp.,*
    399 F.3d 462 (2d Cir. 2005)........................................................ 24

*General Motors Corp. v. Ignacio Lopez de Arriortua,*
    948 F. Supp. 684, 689 (E.D. Mich. 1996)...................................................... 23, 29

*Global Network Commc'ns, Inc. v. City of New York,*
    458 F.3d 150, 154 (2d Cir. 2006).............................................................. 9

*Gmurzynska v. Hutton,*
    257 F.Supp. 2d 621, 628–29 (S.D.N.Y. 2003)............................................. 11

*Gmurzynska v. Hutton,*
    355 F.3d 206, 210 (2d Cir. 2004)............................................................. 11

*Gordon & Breach Science Publishers v. A.I.P.,*
    859 F.Supp. 1521, 1532 (S.D.N.Y.1994) ................................................... 10

*Hans-Jurgen Laube and Oxidwerk HJL AG v. KM Europa Metal AG,*
    No. 96 Civ. 8147, 1998 WL 148427 at *1-2 (S.D.N.Y. 1998)........................ 17

*Innovative Networks, Inc. v. Satellite Airlines Ticketing Ctrs., Inc.,*
    871 F.Supp. 709, 726 (S.D.N.Y. 1995)..................................................... 34

*Int'l. Techs. Consultants, Inc. v. Steward,*
    554 F.Supp.2d 750, 753 (E.D. Mich. 2008)................................................ 34

*Interbrew v. Edperbrascan Corp.,*
    23 F.Supp.2d 425, 427 (S.D.N.Y. 1998) .................................................... 9

*International Technologies Consultants, Inc. v. Steward,*
    554 F.Supp.2d 756, 761 (E.D. Mich. 2008)................................................ 12

*International Technologies Consultants, Inc. v. Steward,* F.Supp.2d
    750, 756, 761 (E.D. Mich. 2008) ........................................................ 11, 30

*Int'l Shipping Co., S.A. v. Hydra Offshore, Inc.,*
    875 F.2d 388, 391-92, *cert. denied, Golub v. Hydra Offshore, Inc.,* 493 U.S. 1003
    (1989).......................................................................................... 5

*Jones v. Ford Motor Credit Co.,*
    358 F.3d 205, 213-14 (2d Cir. 2004) ........................................................ 33

*Kamen v. American Tel. & Tel. Co.,*
    791 F.2d 1006, 1010-1011 (2d Cir. 1986) ................................................... 9

*Litton Systems v. Ssangyong Cement Indus. Co.,*
    107 F.3d 30, reported in full at 1997 U.S. App. LEXIS 2386 (Fed. Cir. Feb. 13,
    1997) ......................................................................................... 22

*Lobo Enterprises, Inc. v. Tunnel, Inc.,*
    822 F.2d 331, 332-333 (2d Cir. 1987) ...................................................... 14

*Maison Lazard et Compagnie v. Manfra, Tordella & Brooks,*
    585 F. Supp. 1286, 1289 (S.D.N.Y. 1984).................................................. 24

*Maison Prunier v. Prunier's Restaurant & Cafe, Inc.,*
   159 Misc. 551, 288 N.Y.S. 529 (1936) ........................................................................... 26

*Majorica, S.A. v. Majorca In't, Ltd,*
   687 F. Supp. 92 (S.D.N.Y. 1988) ................................................................................... 4

*Mattel Inc. v. MCA Records, Inc.,*
   296 F.3d 894, 907-08 (9th Cir. 2002) ............................................................................ 21

*Mobius Mgmt. Sys., Inc. v. Fourth Dimension Software, Inc.,*
   880 F.Supp. 1005 (S.D.N.Y. 1994) ............................................................................... 15

*Nat'l Artists Mgm't Co., Inc., v. Weaving,*
   769 F. Supp. 1224, 1229 (S.D.N.Y. 2003) ..................................................................... 11

*Patane v. Clark,*
   508 F.3d 106, 111 (2d Cir. 2007) ................................................................................... 9

*PPX Enterprises, Inc. v. Audiofidelity, Inc.*, 746 F.2d 120, 124 (2d Cir.1984) ........................... 10

*Proctor & Gamble Co. v. Haugen,*
   222 F.3d 1262, 1273 (10th Cir. 2000) ........................................................................... 14

*Rice v. Scudder Kemper Investments, Inc.,* No. 01 Civ. 7078, 2003 WL 1846934
   (S.D.N.Y. April 8, 2003) ............................................................................................... 5

*Rodgers v. Wright,*
   544 F.Supp.2d 302, 313 (S.D.N.Y. 2008) ..................................................................... 33

*Roquette Am., Inc v. Amylum N.V.,*
   No. 03 CV 0434, 2004 WL 1488384 (S.D.N.Y. July 1, 2004) ........................................... 4

*Smith v. Potter,*
   208 F.Supp.2d 415, 417 (S.D.N.Y. 2002), *aff'd APWU v. Potter*, 343 F.3d 619 (2d
   Cir. 2003) ................................................................................................................... 9

*Societe Des Hotels Meridien v. LaSalle Hotel Operating Partnership*, L.P.,
   380 F.3d 126, 132 (2d Cir. 2004) ................................................................................... 10

*Software AG, Inc. v. Consist Software Solutions, Inc.,*
   No. 08 Civ. 389, 2008 WL 563449 at *14, slip op. (S.D.N.Y. Feb. 21, 2008) ................. 33

*Spotless Enterprises, Inc. v. Carlisle Plastics, Inc.,*
   56 F.Supp.2d 274, 278 (E.D.N.Y. 1999) ....................................................................... 16

*Tao of Sys. Integration, Inc. v. Analytical Serv. & Materials, Inc.*
   299 F.Supp.2d 565, 572-574 (E.D. Va. 2004) ..................................................... 11, 16, 30

*Toho Co. v. Sears, Roebuck & Co.,*
   645 F.2d 788, 793 (9th Cir. 1981) ........................................................................... 20, 24

*Trans World Hosp. Supplies Ltd. v. Hospital Corp. of America,*
   542 F.Supp. 869 (D.C. Tenn. 1982) ............................................................................... 5

*United Mine Workers of Am. v. Gibbs,*
    383 U.S. 715, 725 (1966)............................................................................................ 33

*Vanity Fair Mills, Inc. v. T. Eaton Co.,*
    234 F.2d 633 (2d Cir 1956).................................................................................. 20, 27

*Verizon Directories Corp. v. Yellow Book USA, Inc.,*
    309 F.Supp.2d 401, 404 (E.D.N.Y. 2004) ............................................................. 10

*Vidal Sassoon, Inc. v. Bristol-Myers Co.,*
    661 F.2d 272, 277-278 (2d Cir.1981) .................................................................... 10

*Warnaco Inc. v. VF Corp.,*
    844 F.Supp. 950 (S.D.N.Y.1994) ........................................................................... 31

## STATUTES

15 U.S.C. § 1125(a) ...................................................................................................... 9

15 U.S.C. § 1126(b) .................................................................................................... 19

15 U.S.C. § 1126(h) .................................................................................................... 19

15 U.S.C. § 1127 ........................................................................................................ 18

28 U.S.C. § 1332 .......................................................................................................... 5

28 U.S.C. § 1367 ..................................................................................................... 4, 33

28 U.S.C. § 1653 .......................................................................................................... 5

Plaintiffs INVISTA S.à r.l., INVISTA Technologies S.à r.l. and INVISTA North America S.à r.l. (collectively "INVISTA") respectfully submit this memorandum of law in opposition to the motions filed by Defendants Rhodia S.A. ("Rhodia") and E.I. DuPont De Nemours and Company ("DuPont") (collectively, "Defendants") to dismiss this action for lack of subject matter jurisdiction. Defendant Rhodia seeks dismissal of both the Lanham Act Section 43(a) claim and the Lanham Act Section 44/Paris Convention claim; Defendant DuPont seeks dismissal of the latter claim; and both Defendants argue that the Court should not exercise supplemental jurisdiction.

## PRELIMINARY STATEMENT

This Court has federal question jurisdiction in this case based on either of INVISTA's two meritorious Lanham Act claims and because the remaining state–law claims are sufficiently related to the federal claims to come within the Court's supplemental jurisdiction. Defendants' effort to defeat jurisdiction hinges entirely on the success of their separate motions to dismiss the federal claims. They argue that both federal claims should be dismissed, but they implicitly acknowledge that, if either federal claim survives, jurisdiction exists over the entire case, including the related state–law claims. Jurisdiction is thus intertwined with the question of whether at least one of INVISTA's federal claims is adequately stated for purposes of these motions to dismiss.

Contrary to Defendants' contentions, each of INVISTA's two Lanham Act claims is well–pled. *First,* INVISTA has adequately alleged a cause of action against Rhodia for false advertising under Section 43(a) of the Lanham Act. This claim is based on promotional statements made by Rhodia claiming that Rhodia owns the so–called "Gen 1 technology" and is free to use this technology to build a competing plant for the manufacture of a chemical known as adiponitrile ("ADN"). The Complaint alleges that these statements are literally false and

1

misleading and were intended to deceive and have in fact deceived major customers in the global marketplace for ADN.  It also alleges that INVISTA has been injured and is likely to be injured further as a result of Rhodia's false and misleading statements.

Accepting these allegations as true, as this Court must do at the motion to dismiss stage, INVISTA has stated a valid claim.  It alleges all of the elements of a Section 43(a) false advertising claim—falsity, promotion, deception, materiality, and injury.  Federal courts have repeatedly recognized Lanham Act 43(a) claims arising from illegitimate claims of intellectual property ownership.  Defendants' motions to dismiss offer no persuasive contrary argument or authority.

*Second*, INVISTA sufficiently alleges a claim against Rhodia and DuPont for unfair competition and misappropriation of trade secrets through the Lanham Act's Section 44 and the Paris Convention.  For decades, courts in this Circuit and elsewhere have held that the Paris Convention assures "national treatment," meaning that foreign nationals should have the same rights and protections provided to United States citizens, and thus should be accorded a federal forum to assert claims arising under the Lanham Act and state unfair competition laws.

*Empresa Cubana del Tabaco v. Culbro Corp,* 399 F.3d 462 (2d Cir. 2005), a case heavily relied upon by Defendants, is not to the contrary.  *Empresa* held only that the Paris Convention does not authorize federal courts to create a federal common law of unfair competition.  INVISTA does not invoke any such undefined federal common law here; rather, it seeks a federal forum only to assert *recognized and established state law rights* and thus does not implicate any concern about federal courts creating a federal common law of unfair competition.  As Judge Rakoff recently wrote:  "Neither the Eleventh Circuit in *Int'l Cafe* [252 F.2d 1274 (11th Cir. 2001)] nor the Second Circuit in *Empresa Cubana* said anything as to the Paris

2

Convention's interplay with state common law." *Almacenes Exito S.A. v. El Gallo Meat Market, Inc.* 381 F.Supp 324, 329 (S.D.N.Y. 2005).

Neither DuPont nor Rhodia cites Judge Rakoff's opinion in *Almacenes*. Nor do they mention the numerous other district court opinions, including opinions in this Circuit by Judges Knapp and Sweet,[1] that have held that the combination of the Lanham Act and Paris Convention gives a foreign national treaty–based unfair competition claims based on state law.

Defendants' arguments that this case involves an "extraterritorial" application of the Lanham Act miss wide of the mark. The two Lanham Act claims in the Complaint are based primarily on conduct occurring in the United States, not abroad, including acts of misappropriation occurring in the United States and false representations of technology ownership made to U.S.–based customers and potential business partners. To the extent that INVISTA does allege that Rhodia is planning to use the stolen trade secrets to build a plant in Asia, the record shows that this foreign conduct has a substantial effect on U.S. commerce. Accordingly, United States law is properly applied.

Thus, both of INVISTA's Lanham Act claims are well–pled, and either suffices to anchor this entire case in federal court because, as noted, the remaining claims are covered by supplemental jurisdiction. 28 U.S.C. § 1367. But even if Rhodia were somehow correct that *federal–question* jurisdiction is lacking, there would still be *diversity* jurisdiction as between INVISTA and DuPont, and hence the case would properly remain in federal court if Rhodia were dismissed. Specifically, INVISTA is a Luxembourg corporation headquartered in Wichita,

---

[1] *Maison Lazard et Compagnie v. Manfra, Tordella & Brooks*, 585 F. Supp. 1286, 1289 (S.D.N.Y. 1984) (Knapp, J.); *Majorica, S.A. v. Majorca In't, Ltd*, 687 F. Supp. 92 (S.D.N.Y. 1988) (Sweet, J.). *See also Roquette Am., Inc v. Amylum N.V.*, No. 03 CV 0434, 2004 WL 1488384 (S.D.N.Y. July 1, 2004) (Chin, J.) (allowing unfair competition claim under Lanham Act Section 44 (h)).

Kansas, and DuPont is a Delaware corporation headquartered in Wilmington, Delaware.
(Compl. ¶¶ 18–22). Diversity of citizenship thus exists between INVISTA and DuPont.[2]

Accordingly, the only consequence of dismissing the federal claims is that Rhodia would be dropped as a party and litigation would be split into two separate actions—one against DuPont in this Court and another against Rhodia in state court.[3] That course of proceeding would undoubtedly be inefficient because the claims all arise from a common nucleus of operative facts and should be tried together. Fortunately, it is unnecessary to endure that inefficiency because federal question jurisdiction *does* exist, such that Rhodia must remain in the case.

## SUMMARY OF INVISTA'S ALLEGATIONS

INVISTA filed this lawsuit on August 15, 2008, against Rhodia and DuPont alleging (among other things) violations of the Lanham Act, misappropriation of trade secrets, unfair competition, breach of contract, and tortious interference with contracts.[4] The Complaint seeks injunctive relief stopping Defendants, who have teamed up with one another, from continuing to use and disclose INVISTA's highly–confidential and world–leading chemical process technology and from continuing to engage in other acts of unfair competition, including conduct that violates the Lanham Act. (Compl. ¶¶ 9–17).

---

[2] The Second Circuit has held that a corporation that is incorporated under the laws of a foreign nation is deemed to be an alien for purposes of 28 U.S.C. § 1332, even if its principal place of business is in the United States. *Int'l Shipping Co., S.A. v. Hydra Offshore, Inc.*, 875 F.2d 388, 391-92, *cert. denied*, *Golub v. Hydra Offshore, Inc.*, 493 U.S. 1003 (1989). We note that other courts would for diversity purposes deem INVISTA a Kansas corporation because its headquarters are located there and thus allow this entire case to proceed under diversity jurisdiction. *See, e.g.*, *Trans World Hosp. Supplies Ltd. v. Hospital Corp. of America*, 542 F.Supp. 869 (D.C. Tenn. 1982). INVISTA preserves this argument for appeal, if necessary.

[3] If this Court ultimately determines that federal question jurisdiction does not exist in this case, INVISTA seeks leave to amend its Complaint to plead only claims against DuPont within the Court's diversity jurisdiction. *See, e.g.*, *Rice v. Scudder Kemper Investments, Inc.*, No. 01 Civ. 7078, 2003 WL 1846934 (S.D.N.Y. April 8, 2003) (granting plaintiff leave to amend its complaint pursuant to 28 U.S.C. § 1653 in order to assert diversity jurisdiction).

[4] INVISTA initiated this action the same day it voluntarily dismissed its Texas action. Civil Action No. 1:07–CV–865. As explained in its letter to the Court dated August 27, 2008, INVISTA dismissed the Texas action and filed the present
(footnote continued)

The trade secrets at issue, called the "Gen 1 process," relate to the butadiene–based production of adiponitrile ("ADN"), a critical intermediate chemical used in the manufacture of nylon 6,6. DuPont developed and commercialized the technology in the late 1960s and early 1970s at its research facilities in Texas and Delaware, and then sold it to INVISTA in April 2004. (Compl. ¶¶ 2, 60). As part of the 2004 transaction, in which INVISTA paid DuPont approximately $4 billion, DuPont became obligated not to disclose the Gen 1 technology and other trade secrets and not to compete against INVISTA in the ADN–manufacturing business. (Compl. ¶¶ 60–65).

Defendant Rhodia obtained unlawful access to the Trade Secrets through a joint venture between affiliates of INVISTA and Rhodia and in part through its contacts with the United States. The joint venture, called Butachimie SNC ("Butachimie"), operates an ADN plant in Chalampé, France using the Gen 1 technology. The parties to the joint venture signed strict confidentiality agreements agreeing to use the Trade Secrets *only* for use in operating the joint venture plant and not for any other purpose. (Compl. ¶¶ 54–55).

Rhodia's employees, who were seconded to work at the joint venture, were bound by duties of loyalty and confidentiality and could not lawfully transfer the technology to Rhodia for its own use in building a new plant in Asia or elsewhere. (Compl. ¶¶ 52, 55, 57, 110, 117). Yet Rhodia employees, without informing INVISTA or the general manager of the Butachimie plant, have secretly seized *tens of thousands of Gen 1 technical documents* from Butachimie and transported them to other locations where Rhodia's design team is working.

Having stolen the core technology from the parties' joint venture and from information learned in technical exchange meetings in the United States (Compl. ¶¶ 110), Rhodia

action because of subsequent information that came to light about DuPont's involvement in the scheme and because of the (footnote continued)

5

has now announced to the world that it is moving forward with plans to build an ADN plant in Asia. Simultaneously, Rhodia has embarked upon a campaign to compete unfairly with INVISTA and to sabotage and undermine its business. *First*, Rhodia wrongfully obtained access to and is currently using INVISTA's Gen 1 technology to design, construct, and start–up a competing ADN plant using INVISTA's trade secrets. Rhodia has a design team of engineers who are actively working to design a new plant using INVISTA's Gen 1 technology, and Rhodia has also contacted and made disclosures to engineering firms, vendors, governmental agencies, and investors.

*Second* Rhodia has misrepresented to INVISTA's customers, potential customers, and commercial suppliers in the U.S. and abroad that it has an ownership interest in INVISTA's Gen 1 technology, and has freedom to use the technology anywhere in the world as an independent supplier of ADN. Rhodia has also told prospective partners in the venture (including DuPont in Delaware and Chevron Phillips Chemical Company in Texas) that it has freedom to use the Gen 1 technology, and it has made similar statements to customers and suppliers in the United States and abroad. (Compl. ¶¶ 5, 90, 100). These misrepresentations were made to gain unfair commercial advantage and damage INVISTA's goodwill, and have already created customer confusion in the marketplace by causing them to associate INVISTA's world–leading technology with Rhodia. (Herzog Decl. ¶¶ 13–15).

*Third*, Rhodia has tortiously interfered with at least two agreements between INVISTA and DuPont through which INVISTA acquired the Gen 1 technology—a Purchase and Sale Agreement (the "PSA") and a Patent and Technical Information Agreement (the "PTIA"). Rhodia has induced DuPont—INVISTA's largest customer—to breach these agreements by,

---

exclusive New York venue provisions in the contracts between DuPont and INVISTA.

among other things, soliciting DuPont to make a substantial investment in Rhodia's new proposed ADN plant in Asia and to team up with DuPont to use technology misappropriated from INVISTA to design and build that new plant. (Compl. ¶¶ 82–87).

DuPont's involvement with Rhodia's new ADN plant involves more than just financial support. DuPont has discussed technical, commercial, and legal issues with Rhodia and has provided Rhodia with confidential information about the Gen 1 process—the same process that DuPont sold to INVISTA in 2004. (Compl. ¶¶ 88–89). DuPont has also been assisting Rhodia to identify former employees who possess particular types of information—including privileged and confidential information—and to arrange interviews with those former employees. During these interviews, Rhodia's counsel, with DuPont's active participation, has sought to induce the employees to divulge attorney–client privileged and confidential information in hopes of eliciting opinions that might be helpful to Rhodia. (Compl. ¶ 89).

Based on these allegations, INVISTA asserts two Lanham Act claims and ten state law claims.

## STANDARDS FOR MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION

Defendants' bring their motions pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6). A challenge to jurisdiction under Rule 12(b)(1) may take two forms: a facial challenge to the allegations in the complaint or a factual challenge. Defendants appear to have chosen to mount a facial challenge, though they cite only cases involving factual challenges for the burden of proof. (DuPont Mem. 6–7; Rhodia Mem. 4–5).[5] Under a facial challenge to jurisdiction, the court must accept as true the allegations contained in the Complaint. *Dow Jones & Co., Inc. v. Harrods,*

---

[5] INVISTA is submitting with this Brief the declaration of Benjamin Herzog that contains facts relevant to the Court's jurisdiction over INVISTA's Lanham Act claims. If Defendants wish to challenge the facts contained in this declaration, in whole or in part, INVISTA respectfully requests appropriate discovery and an evidentiary hearing.

*Ltd.*, 237 F.Supp.2d 394, 404 (S.D.N.Y. 2002); *Smith v. Potter*, 208 F.Supp.2d 415, 417

(S.D.N.Y. 2002), *aff'd APWU v. Potter*, 343 F.3d 619 (2d Cir. 2003).  Even under a facial

challenge, however, a plaintiff may present evidentiary matter by affidavit or otherwise.  *Kamen*

*v. American Tel. & Tel. Co.,* 791 F.2d 1006, 1010-1011 (2d Cir. 1986); *Interbrew v.*

*Edperbrascan Corp.*, 23 F.Supp.2d 425, 427 (S.D.N.Y. 1998).  If the defendant then wants to

counter the plaintiff's factual evidence, the jurisdictional challenge becomes a factual one and

the plaintiff is then entitled to discovery and an evidentiary hearing.  2 MOORE'S FEDERAL

PRACTICE 3d § 20.30[4], at 12-44; *See Kamen*, 791 F.2d at 1011.

Similarly, on a motion to dismiss pursuant to Rule 12(b)(6), the court must take

the factual allegations in the complaint as true and draw all inferences in the light most favorable

to non–moving party.  *Patane v. Clark*, 508 F.3d 106, 111 (2d Cir. 2007), *citing Global Network*

*Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 154 (2d Cir. 2006).  A district court may

dismiss a claim under Fed.R.Civ.P. 12(b)(6) only if the plaintiff's factual allegations are

insufficient "to state a claim to relief that is plausible on its face."  *Bell Atlantic Corp. v.*

*Twombly*, 127 S.Ct. 1955, 1960 (2007).

## I.  <u>INVISTA HAS PLED A VALID LANHAM ACT 43(a) CAUSE OF ACTION</u>

Count II of INVISTA's Complaint alleges a claim under Section 43(a) of the

Lanham Act (Compl. ¶¶ 99–105), which prohibits a wide range of false or misleading statements

that are made in commercial advertising or promotion.  Section 43(a)(1)(B) permits a competitor

to sue for any false or misleading statement or description of fact about a product, service or

commercial activity, 15 U.S.C. § 1125(a); as a remedial statute, it should be broadly construed.

*Gordon & Breach Science Publishers v. A.I.P.*, 859 F.Supp. 1521, 1532 (S.D.N.Y.1994), *citing*

8

*PPX Enterprises, Inc. v. Audiofidelity, Inc.*, 746 F.2d 120, 124 (2d Cir.1984); *see also Vidal Sassoon, Inc. v. Bristol-Myers Co.*, 661 F.2d 272, 277-278 (2d Cir.1981).[6]

### A.    INVISTA Has Pled A Cognizable Claim For False Advertising Under 43(a)(1)(B)

To state a cause of action for misleading advertising under the Lanham Act, a plaintiff must allege that: (1) the defendant has made a false or misleading statement, description, or representation of fact concerning the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, *or commercial activities;* (2) the representations were used in commerce; (3) the representations were made in the context of commercial advertising or promotion; and (4) the defendant's actions made the plaintiff believe it would be damaged by the representations. *Verizon Directories Corp. v. Yellow Book USA, Inc.*, 309 F.Supp.2d 401, 404 (E.D.N.Y. 2004); *Societe Des Hotels Meridien v. LaSalle Hotel Operating Partnership*, L.P., 380 F.3d 126, 132 (2d Cir. 2004), *citing* 15 U.S.C. 1125(a)(1)(B).

Additionally, to satisfy the third element of commercial advertising or promotion, a statement must be: (1) commercial speech, (2) made for the purpose of influencing consumers to buy defendant's goods or services, and (3) although representations less formal than those made as part of a classic advertising campaign may suffice, they must be disseminated sufficiently to the relevant purchasing public. *Gmurzynska v. Hutton*, 355 F.3d 206, 210 (2d Cir. 2004) (citations omitted). "Commercial speech is 'speech which does no more than propose a commercial transaction.'" *Id.*[7]

---

[6] INVISTA asserts only a cause of action for false advertising under Section 43(a)(1)(B). Accordingly, Rhodia's arguments about "reverse-passing off" and "false designation of origin" under Section 43(a)(1)(A) are beside the point. (Rhodia Mem. 15-17).

[7] Rhodia's proposed test for false advertising is misleading: it leaves out a portion of the statute as well as controlling Second Circuit law. (Rhodia Mem. 17-18). The test cited by Rhodia from *Gmurzynska v. Hutton*, 257 F.Supp. 2d 621, 628–29 (S.D.N.Y. 2003) replaces the phrase "goods, services, or commercial activities" in 43(a)(1)(B) with a formulation that uses only the word "services." Rhodia cites no authority for limiting the scope of 43(a)(1)(B) to "services" because no such authority (footnote continued)

## 1.    Section 43(a)(1)(B) Encompasses False Claims of Technology Ownership

Contrary to Rhodia's argument, false and misleading claims of technology ownership have long been recognized as giving rise to a claim under Section 43(a).  *See, e.g., Ace Novelty Co., Inc. v. Vijuk Equipment, Inc.*, No. 90 C 3116., 1990 WL 129510, at *7 (N.D. IL. Aug. 31, 1990) (denying motion to dismiss where plaintiff's 43(a) claim was based on defendants' assertion of inventorship); *International Technologies Consultants, Inc. v. Steward*, F.Supp.2d 750, 756, 761 (E.D. Mich. 2008) (denying motion to dismiss where plaintiff alleged that defendant falsely represented ownership of plaintiff's technology); *Tao of Sys. Integration, Inc. v. Analytical Serv. & Materials, Inc.* 299 F.Supp.2d 565, 572-574 (E.D. Va. 2004) (denying motion to dismiss where plaintiff alleged that defendant had misrepresented ownership of proprietary information and test results).[8]

Particularly instructive is *Ace Novelty Co., Inc. v. Vijuk Equipment, Inc.*, No. 90 C 3116., 1990 WL 129510, at *7 (N.D. IL. Aug. 31, 1990), a case in which the plaintiff (Ace) developed an idea for a new type of "soft ticket" for use in a novelty game of chance.  The plaintiff contacted the defendant for assistance in commercializing the invention.  After negotiations broke down, plaintiff learned that the defendant had contacted third parties,

---

exists.  Both *Gmurzynska* and the case it draws upon also referenced 43(a)(1)(B)'s application to "goods" and "commercial activities," 257 F.Supp.2d at 629-630; *Nat'l Artists Mgm't Co., Inc., v. Weaving*, 769 F. Supp. 1224, 1229 (S.D.N.Y. 2003), and subsequent Second Circuit cases quote the statute in a more complete fashion.  *E.g. Societe Des Hotels Meridien*, 380 F.3d at 132.  Moreover, the Second Circuit has repeatedly refused to adopt the commercial competition prong used in Rhodia's version of the test.  (Rhodia Mem. 18).  *E.g. Gmurzynska v. Hutton*, 355 F.3d 206, 210 (2d Cir. 2004).

[8]    *See also Spotless Enters., Inc. v. Carlisle Plastics, Inc.*, 56 F.Supp.2d 274, 278 (E.D.N.Y 1999) (defendant's false representations of patent infringement stated a claim for false advertising under 43(a)); *Keller Med. Specialties v. Armstrong Med. Indus.*, 842 F. Supp. 1086 (N.D. Ill. 1994) (denying summary judgment where defendant's claim to have sole or exclusive distribution of medical product formed the basis for plaintiff's false advertising complaint); *Animal Fair Inc. v. Amfesco Indus. Inc.*, 620 F. Supp. 175, (D. Minn. 1985), *aff'd*, 794 F.2d 678 181, 190 (8th Cir. 1986) (finding defendant's advertising claim of exclusive rights to make a slipper product "grossly misleading"); *Panterra Engineered Plastics, Inc. v. Transportation System Solutions, LLC*, 539 F.Supp.2d 600, 603 (D. Conn. 2008) (denying defendant's motion for summary judgment where plaintiff's 43(a) claim for deceptive advertising was dependent on its claim that defendant had misappropriated its trade secrets to produce the product).

claiming the plaintiff's trade secrets as its own. *Id.*, at *2-3, *7. The Court denied the defendant's motion to dismiss a Lanham Act 43(a) false advertising claim, stating that:

> "Ace claims that the defendants have represented and will
> represent the new soft ticket as their very own conception. . . .
> But if what Ace alleges happened is true, and we are obligated
> to assume it is for purposes of this motion, then these
> representations are bald-faced lies because the ticket itself was
> designed by Ace's Loren Greenwood. *This is the essence of a*
> *false statement made for the purpose of selling a product.*
> Defendants' nigglingly narrow construction of § 43(a)'s
> substantive reach ignores all of the more recent case law as well
> as the 1988 amendment."

*Id.* at *7. (emphasis added).

More recently, in *International Technologies Consultants, Inc. v. Steward*, 554 F.Supp.2d 756, 761 (E.D. Mich. 2008), plaintiff brought a Section 43(a) claim based on the defendant's assertions that it owned plaintiff's float glass technology. The plaintiff alleged that these assertions of technology ownership were false and misleading and were intended to deceive a client as to ownership of the technology and to influence purchasing decisions. The District Court denied defendants' motion to dismiss the 43(a) claim.

In yet another case of alleged technology ownership, *Tao of Systems Integration*, 299 F.Supp.2d 565, 572-574 (E.D. Va. 2004), an employer sued a former employee and his new employer claiming that the defendants had falsely claimed ownership of certain proprietary information and test results that actually belonged to the plaintiff. As a result of the misrepresentations, the new employer had secured a contract with NASA and had caused NASA to believe—wrongly—that the technology in question actually belonged to the defendants. Agreeing with the plaintiff that these types of misrepresentations could state a claim for false advertising under Section 43(a), the Court denied the defendants' motion to dismiss. *Id.* at 574.

These cases share a common thread: Each allowed a Section 43(a) claim based on false and misleading claims of intellectual property ownership, reasoning that illegitimate claims of ownership of intellectual property are within the scope of conduct prohibited by Section 43(a). The Complaint in this case likewise alleges a valid Section 43(a)(1)(B) violation based on Rhodia's repeated and widespread misrepresentations of ownership of the Gen 1 technology.

### 2.       Misrepresentations of Fact

First, the Complaint alleges that Rhodia made a series of false and misleading statements to potential customers, many of whom are current INVISTA customers, to the effect that Rhodia has "freedom to use the Gen 1 technology to build and operate a new ADN plant in Asia" and that "[Rhodia] is a co–holder of the [Gen 1] technology." (Compl. ¶ 100). Rhodia also misrepresented to DuPont in Delaware that it has rights to use the Gen 1 technology and that "INVISTA is not the sole technology holder of the Gen 1 process." (Id. ¶ 90). Rhodia has made similar misrepresentations to Chevron Phillips in Texas, as well as to customers, suppliers, and potential business partners, both in the United States and abroad. (Id. ¶¶ 5, 70–72, 90, 100).

Contrary to Rhodia's argument (Rhodia Mem. 18), these statements misrepresent the "nature, characteristics, qualities, or geographic origin" of both INVISTA's and Rhodia's ADN–related commercial activities, including Rhodia's efforts to build a new ADN plant. Building and operating a $100 million petrochemical plant is clearly a "commercial activity" within the scope of the Lanham Act. *See Proctor & Gamble Co. v. Haugen*, 222 F.3d 1262, 1273 (10th Cir. 2000) ("It is therefore apparent, in the context of the Act's broad purpose of proscribing unfair competition and the 1988 amendment of § 43(a), that Congress did not intend to narrowly limit the term "commercial activities," but rather intended to encompass those activities which do not solely involve the provision of services or the production of goods").

12

### 3.    Interstate Commerce

The false statements at issue also easily satisfy the "used–in–commerce" test, which asks only whether the statements were made in interstate commerce. Citing *Demetriades v. Kaufmann*, 698 F. Supp. 521, 524 (S.D.N.Y. 1988), Rhodia argues that the Complaint is "bereft" of allegations of false representations by Rhodia in U.S. commerce (Rhodia Mem. 18). But "commerce" for these purposes means "all commerce within the ambit of the Commerce Clause, U.S. Const. art. I, § 8, cl. 3, as that clause has been construed by the courts." 698 F.Supp. at 524. *Demetriades* itself recognized that the "long reach" of the Lanham Act applies to even wholly intrastate activities if they "may be said to affect plaintiff's business and that business is interstate." *Id.*

The Complaint makes clear that the market for ADN is a global market and that Rhodia's false representations were made to DuPont in Delaware, Chevron Phillips in Texas, as well as customers, suppliers, and potential business partners, both in the United States and abroad. (Compl. ¶¶ 5, 70–72, 90, 100, 102). These allegations are sufficient to satisfy the interstate commerce requirement. *See Demetriades,* 698 F. Supp. 521, 524 (S.D.N.Y. 1988) (out of state advertising sufficient to meet commerce requirement); *Lobo Enterprises, Inc. v. Tunnel, Inc.*, 822 F.2d 331, 332-333 (2d Cir. 1987) (same).

### 4.    Commercial Advertising or Promotion

The Complaint alleges that Rhodia made these statements in the context of commercial advertising or promotion. Rhodia does not challenge this prong of the Section 43(a) test, nor could it. (Rhodia Mem. 17–19). Rhodia's statements about owning the Gen 1 technology were made to customers, suppliers, and potential business partners; the statements were obviously intended to influence them either to buy products from Rhodia or to associate with Rhodia's venture. Rhodia was promoting itself as a nascent independent and legitimate

13

supplier of ADN. (Compl. ¶¶ 70–72, 100, 102). *See, e.g., Mobius Mgmt. Sys., Inc. v. Fourth Dimension Software, Inc.*, 880 F.Supp. 1005 (S.D.N.Y. 1994) (a single letter from a computer software manufacturer to a potential customer could constitute "advertising or promotion").

###     5.     Harm To INVISTA

Finally, the Complaint alleges harm to INVISTA that is directly linked to the false and misleading representations. Indeed, the Complaint alleges that Rhodia's statements have already induced DuPont, INVISTA's largest customer, to breach contracts with INVISTA and join forces with Rhodia. (Compl. ¶¶ 82–90). The Complaint thus alleges a specific causal link between the challenged statements and the harm to INVISTA. Because INVISTA is the recognized technology leader in the market for ADN and the exclusive owner of the world–renowned Gen 1 technology, Rhodia's false and misleading misrepresentations unfairly trade on INVISTA's goodwill, impugn its technology and competitive advantage, and cause consumer confusion in the marketplace.

*     *     *     *     *

In short, INVISTA has pled a valid section 43(a) claim that is based on unfair competitive practices that are within the ambit of the Lanham Act, and that cause real harm to INVISTA.

###     B.     Rhodia's Arguments Are Unpersuasive

In arguing for dismissal of the Section 43(a) claim, Rhodia makes the sweeping assertion that "[s]tatements about processes and technologies are not actionable under Section 43(a)." (Rhodia Mem. 14). According to Rhodia, a plaintiff seeking to bring a Section 43(a)(1) claim must allege that the violation occurred in connection with "goods and services" or "any container of goods." (Rhodia Mem. 14–16). In Rhodia's view, it is not enough to make

14

statements about processes or technologies that produce the goods or services. As the cases cited in the previous section establish, this is not a correct statement of the law.

To be sure, Section 43(a)(1) uses the language "in connection with any goods or services, or any container of goods." But courts have interpreted this language to make actionable false claims of intellectual property ownership made during or as part of efforts to promote the sale of a product, or to furnish a commercial service.[9] For example, in *Spotless Enterprises, Inc. v. Carlisle Plastics, Inc.*, 56 F.Supp.2d 274, 278 (E.D.N.Y. 1999), the Court found allegations that false claims of patent ownership made "during [plaintiff's] sales and marketing efforts to promote the sale of their products, [was] an effective allegation that [plaintiff's] claims were made in commercial advertising or promotion." *Id.* at 278; *see, e.g., Tao of Sys. Integration, Inc. v. Analytical Servs. & Materials, Inc.*, 299 F.Supp.2d 565, 572-574 (E.D. Va. 2004) (false assertion of ownership in connection with engineering services).

INVISTA makes the very same claims here. It alleges that Rhodia made false claims of ownership of the Gen 1 technology in the course of meeting with customers and trying to secure from them long–term supply agreements for the sale of ADN. (Compl. ¶¶ 5, 71, 75–77, 82–83, 90, 100–102). Rhodia did not just make abstract claims of intellectual property ownership. Rather, it made these claims in connection with efforts to sell and market ADN. Because the false claims of intellectual property ownership were directly connected to sales and marketing of product, they were made "in connection with any goods or services" within the meaning of Section 43(a)(1).

---

[9] Rhodia, aside from misciting *Tubeco, Inc. v. Crippen Pipe Fabrication Corp.*, 402 F.Supp. 838 (E.D.N.Y 1975), as a Southern District decision, misunderstands its import. The Court in *Spotless Enterprises*, 56 F.Supp.2d 274, 280-281 (E.D.N.Y. 1999), refused to apply the analysis in *Tubeco* because, among other things, *Tubeco* represented 25-year old reasoning in a rapidly developing body of law substantially expanded by the 1988 amendments to the Lanham Act.

The cases cited by Rhodia are all distinguishable on this basis. In *Digigan, Inc. v. Ivalidate, Inc.*, No. 02 Civ. 420, 2004 WL 203010 at *5 (S.D.N.Y. 2004) (cited in Rhodia Mem. 14–15), the plaintiff alleged misrepresentation of patent ownership and sales of goods embodying the patent, but did not allege "the necessary connection between the misrepresentations of fact and goods or services." *Id.* Similarly, in *Hans-Jurgen Laube and Oxidwerk HJL AG v. KM Europa Metal AG*, No. 96 Civ. 8147, 1998 WL 148427 at *1-2 (S.D.N.Y. 1998), the plaintiff alleged that defendant misrepresented ownership of a patent when it had licensed *the disputed patent* to a third party. But there was no allegation that the defendant had made the misrepresentations as a part of marketing activities. *Id.* at *2 n. 1.

Unlike these cases, the false statements in this case were part of a larger marketing and promotional effort by Rhodia to sell ADN. As the Complaint makes clear, Rhodia is using the false assertions of ownership of the Gen 1 technology to gain competitive advantage in the market for ADN, trade on INVISTA's goodwill, and cause customers to break supply contracts with INVISTA and purchase their ADN needs from Rhodia. (Compl. ¶¶5, 82–84, 90, 100–102) Rhodia has made these statements in connection with Rhodia's anticipated entry into the market as an independent supplier of ADN, and in connection with the commercial activity of building an ADN plant that will use the Gen 1 technology. (Compl. ¶¶ 5, 69–76, 100, 102). These allegations are more than sufficient to connect the false statements to efforts to sell a product or service.

## II.     INVISTA HAS PLED A VALID CLAIM UNDER LANHAM ACT SECTION 44 AND THE PARIS CONVENTION

INVISTA's other federal claim is brought pursuant to the Lanham Act and the Paris Convention. INVISTA does not seek to use these provisions to create a new, federal tort of unfair competition. Instead, it seeks only a federal forum to bring recognized and well–defined

16

state law causes of action. Many courts have held that, while Section 44 and the Paris Convention do not create a federal common law of unfair competition, they do allow a foreign national (such as INVISTA) to sue in a federal court basing its unfair competition claim on either Section 43(a) of the Lanham Act or state law.

Defendants argue that this claim should be dismissed on two grounds: (1) the claim is foreclosed by the Second Circuit's 2005 decision in *Empresa Cubana del Tabaco v. Culbro Corp,* 399 F.3d 462 (2d Cir. 2005); and (2) allowing the claim would involve an extraterritorial application of the Lanham Act. (DuPont Mem. 7–20; Rhodia Mem. 6–20). Neither argument is persuasive.

### A.    Section 44 and the Paris Convention Provide A Federal Forum For INVISTA To Assert State Law Claims

#### 1.    Structure of the Lanham Act and Paris Convention

The Lanham Act addresses trademark infringement and other acts of unfair competition. Section 45 of the Act states that one of Congress' purposes was to incorporate into federal law the rights and remedies guaranteed by international treaties and conventions concerning unfair competition. 15 U.S.C. § 1127. ("The intent of this chapter is . . . to provide rights and remedies stipulated by treaties and conventions . . . .").

Section 44(b) of the Lanham Act gives effect to this intent. It confers on foreign citizens the right to enforce the substantive protections guaranteed them by treaties and conventions concerning unfair competition:

> Any person whose country of origin is a party to any convention or treaty relating to trademarks, trade or commercial names, or the repression of unfair competition, to which the United States is also a party, . . . shall be *entitled to the benefits of this section* under the conditions expressed herein *to the extent necessary to give effect to any provision of such convention*, treaty, or reciprocal law, *in addition to* the rights which any owner of a mark is otherwise entitled by this chapter.

17

15 U.S.C. § 1126(b) (emphasis added).

Section 44(h) refers back to subsection (b) and specifies that foreigners are entitled "to protection against unfair competition":

> Any person designated in subsection (b) of this section as entitled to the benefits and subject to the provisions of this chapter shall be entitled to effective protection against unfair competition, and the remedies provided in this chapter for infringement of marks shall be available so far as they may be appropriate in repressing acts of unfair competition.

15 U.S.C. § 1126(h).

INVISTA's treaty rights in this case arise under the Paris Convention for the Protection of Industrial Property ("Paris Convention"), to which the United States and Luxembourg (the country of INVISTA's incorporation) are parties.[10]  The parties to the Paris Convention "constitute a Union for the protection of industrial property" (Art. 10). The "protection of industrial property" expressly includes the protection of "industrial designs" and "the repression of unfair competition." (Art. 1(2)).  Article 10 requires protection against acts of unfair competition, including "any act of competition contrary to honest practices in industrial or commercial matters." (July 14, 1967, art. 10bis, 21 U.S.T 1583).

The Paris Convention is essentially a compact between the various member countries to provide the same treatment to foreign nationals as they provide to their own citizens. The Paris Convention ensures that "foreign nationals should be given the same treatment in each of the member countries as that country makes available to its own citizens" as to trademark and

---

[10]    The Paris Convention has over 100 members, including the United States and all other industrialized nations.

18

other state–law rights. *Vanity Fair Mills, Inc. v. T Eaton Co.*, 234 F.2d 633, 640 (2d Cir. 1956).[11]

### B.    The Case Law

The interplay between the Lanham Act and international treaties has been considered by a number of courts in this Circuit and elsewhere in cases brought by foreign nationals. One of the leading decisions is *Toho Co. v. Sears, Roebuck & Co.*, 645 F.2d 788, 793 (9th Cir. 1981) , in which the Ninth Circuit analyzed the relationship between Section 44 and the Treaty of Friendship, Commerce and Navigation entered into between the United States and Japan ("Japanese Friendship Treaty").

At issue in *Toho* was whether a Japanese plaintiff stated a claim under the Lanham Act when it alleged that Sears Roebuck's use of a character known as "Bagzilla" constituted an improper use of the plaintiff's comic character "Godzilla." The plaintiff invoked the combination of the Lanham Act and the Japanese Friendship Treaty. Like the Paris Convention, the Japanese Friendship Treaty requires that Japanese companies be treated as favorably as domestic companies with respect to trademarks and other forms of industrial property.

The Ninth Circuit held that Section 44(h) of the Lanham Act required that Toho— a Japanese national—be afforded the same protections available to U.S. citizens: trademark infringement remedies, remedies for "passing off," and *various state law causes of action. Toho*, 645 F.2d at 791-93. The *Toho* court did not hold that a treaty–based state law claim needs to be appended to another federal claim for federal jurisdiction to exist. Instead, the court made clear

---

[11]    Article 10bis of the Paris Convention is not premised on a narrow meaning of "unfair competition" as it is understood in American law. Instead, it adopts the more liberal construction of European countries such as France, Germany, and Switzerland. *General Motors Corp. v. Ignacio Lopez De Arriortua*, 948 F. Supp 684 (E.D. Mich 1996). *See generally* Callman, *The Law of Unfair Competition, Trademarks and Monopolies*, § 2610 (4th ed. 1994).

that the "practical effect of Section 44 and this treaty is to provide a *federal forum in which Toho can pursue its state law claims.*" *Toho*, 645 F.2d at 793 (Emphasis added).[12]

The Ninth Circuit again took up the issue of the interplay between the Lanham Act and international treaties in *Mattel Inc. v. MCA Records, Inc.*, 296 F.3d 894, 907-08 (9th Cir. 2002). Unlike *Toho*, *Mattel* involved a claim by an American plaintiff seeking to invoke the Paris Convention pursuant to Section 44(i) of the Lanham Act. Mattel sought to assert a *federal* claim of unfair competition. The Ninth Circuit reaffirmed the core holdings of *Toho* that Section 44(h) creates "a federal right co–extensive with the provisions of the treaty involved" and that Section 44(h) provides a foreign plaintiff "with a federal forum in which to bring its state unfair competition claims." *Mattel*, 296 F.3d at 907.

The Ninth Circuit did refuse to allow Mattel to assert its *federal* common law claim of unfair competition because no such claim existed.[13] But, the Court made clear that Mattel—like a foreign litigant—would be afforded all of the substantive protections of the Paris Convention: remedies for trademark infringement, remedies for false designation of origin, and *state law claims for unfair competition. See Mattel*, 296 F.3d at 907-08 ("Accordingly, Mattel is entitled to assert a cause of action under the Lanham Act for trademark infringement . . . or for false designation of origin . . . or it may assert state law claims for unfair competition, which it did"). Thus *Mattel*—like *Toho*—understood that a plaintiff could invoke the Lanham Act and

---

[12] Relying on *BP Chemiclas Ltd. v. Yankuang Group Boyang Foreign Economic Trade Co.*, No. CV 03-08167 PA (JTLx), Slip Op. (C.D. Cal. Mar. 23, 2004), DuPont attempts to distinguish *Toho* by arguing that the state law claims in *Toho* were before the Court through pendent jurisdiction. (DuPont Mem. 14). But that does not square with what the *Toho* court did. *Toho* held that Section 44 of the Lanham Act, in conjunction with unfair competition treaties, created a separate federal cause of action that incorporated applicable state law rights and remedies. Thus, it was not pendent jurisdiction that gave Toho a federal forum for its state law claim, but the combination of the Lanham Act and the Japanese Friendship Treaty. *See Litton Systems v. Ssangyong Cement Indus. Co.*, 107 F.3d 30, 34, reported in full at 1997 U.S. App. LEXIS 2386 (Fed. Cir. Feb. 13, 1997) (adopting similar interpretation of *Toho*).

[13] Courts early on rejected the notion that the Lanham Act created a federal claim for unfair competition beyond the express terms of the Act. *Iowa Farmers Union v. Farmers' Educational and Co-operative Union*, 247 F.2d 809 (8th Cir. 1957).

the Paris Convention to assert a cause of action in federal court based on *state* unfair competition law.

      *Toho* and *Mattel* stand for the proposition that Section 44 of the Lanham Act creates a federal forum for assertion of state law rights and remedies available under international unfair competition treaties in addition to those under the Lanham Act.[14]  To be sure, while *Toho* and *Mattel* both allowed claims based on "state unfair competition law," neither involved claims of trade secret misappropriation.  Nonetheless, consistent with the plain language of Section 44 and the Paris Convention, other courts have made this logical step, holding that Section 44 and the Paris Convention do encompass unfair competition claims founded on trade secret misappropriation—the very claims asserted by INVISTA here.

      *Litton Systems v. Ssangyong Cement Indus. Co.,* 107 F.3d 30, reported in full at 1997 U.S. App. LEXIS 2386 (Fed. Cir. Feb. 13, 1997), is instructive.  There, the court invoked the language of *Toho* to reject arguments that treaty claims under the Lanham Act are limited to trademark protection and specifically allowed the plaintiff to pursue state–law trade secret misappropriation claims:

> Toho therefore directly supports the district court's reliance on section 44 as providing a basis for federal jurisdiction in this case. . . . As construed by the court in Toho, section 44 creates a federal cause of action that incorporates state law rights and remedies in addition to the remedies of the Lanham Act as appropriate to repress unfair competition.

*Litton,* 1997 U.S. App. LEXIS 2386, at *1314 (emphasis added); *see also General Motors Corp. v. Ignacio Lopez de Arriortua,* 948 F. Supp. 684, 689 (E.D. Mich. 1996).

---

[14]  Contrary to DuPont's assertion (DuPont Mem. 14-15), the subsequent Ninth Circuit decision in *Grupo Gigante SA De CV v. Dallo & Co.,* 391 F.3d 1088 (9th Cir 2004), did not "overrule" *Toho* or *Mattel.*  This case held only that, consistent with *Mattel* and *Toho,* a foreign national cannot assert a federal common law claim for unfair competition through the Lanham Act and Paris Convention.  The court did not address the question of using the treaty and the Lanham Act to bring a state law claim.

Similarly, in *BP Chemicals v. Baloun*, 183 F. Supp. 2d 1158 (E.D. Mo. 2000), the claims at issue involved unfair competition under the Paris Convention based on the misappropriation of trade secrets by a former BP employee. The former employee argued that the Lanham Act provided no remedy for BP's trade secret misappropriation claims. The court rejected this argument, holding that "the Lanham Act does provide a federal forum in which a foreign national can bring a claim of unfair competition through misappropriation of trade secrets." *Baloun*, 183 F. Supp. 2d at 1161.

Likewise, in *BP Chemicals Ltd. v. Formosa Chemical & Fibre Corp.*, No. 97-CV-4554 (D.N.J. May 14, 1998), the district court in New Jersey acknowledged that BP's complaint involved state–law claims of trade secret misappropriation, rather than federal trademark or service mark infringement. Nonetheless, the Court upheld jurisdiction under Section 44 of the Lanham Act and the Paris Convention:

> Plaintiff's claims arise under "[t]he combination of Section 44 of the Lanham Act and the Paris Convention, to which the United States and Great Britain are signatories. Under these provisions, BP Chemicals (a British corporation) enjoys a *federal right to sue for acts of unfair competition and to invoke state law rights and remedies in pursuing a federal cause of action in federal court.*"

*BP Chemicals, Ltd. v. Formosa Chemical & Fibre Corp.*, No. 97-CV-4554, at 24 n.23 (D.N.J. May 14, 1998) (emphasis added).

Courts in this District have reached a similar result. In *Maison Lazard et Compagnie v. Manfra, Tordella & Brooks*, 585 F. Supp. 1286, 1289 (S.D.N.Y. 1984), Judge Knapp held that a citizen of France could invoke the protections of the Lanham Act and Paris Convention to assert New York law unfair competition claims in federal court. In upholding jurisdiction, the court reasoned:

> The Paris Convention, to which the United States and France are both signatories, assures nationals of such countries "effective protection

22

against unfair competition." On the basis of these provisions, plaintiff Maison Lazard asserts a federal cause of action for acts of unfair competition which occurred in the United States. *It seems to us established, under the authority of Toho Co. Ltd.v. Sears Roebuck & Co.(9th Cir. 1981) 645 F.2d 788, 792-93, that such a cause of action exists.*

*Id.*; *see also Majorica, S.A. v. Majorca Int'l, Ltd*, 687 F. Supp. 92 (S.D.N.Y. 1988) (Sweet, J.) ("*Maison Lazard* and *Toho* stand for the proposition that a foreign plaintiff may invoke the Paris Treaty together with the Lanham Act to assert a federal claim of unfair competition").

### C.    The Second Circuit's *Empresa* Decision Does Not Dictate a Different Result

Contrary to Rhodia's argument, *Empresa Cubana del Tabaco* v. *Culbro Corp.*, 399 F.3d 462 (2d Cir. 2005), does not dictate a different result in this case. In *Empresa*, the plaintiff Cubatabaco, a Cuban cigar manufacturer, sought to maintain a federal claim for unfair competition under the Paris Convention pursuant to Sections 44(b) and (h) of the Lanham Act. The Second Circuit did hold that the foreign plaintiff could not maintain a separate *federal* cause of action for unfair competition because the right provided by the Paris Convention is only a right to "national treatment." 399 F.3d at 485. However, the Court specifically allowed the foreign plaintiff to assert state law unfair competition claims.

The pertinent section of the court's opinion is found at 399 F.3d at 484-85. The Court quotes a case from the Eleventh Circuit, *Int'l Cafe* v. *Hard Rock Cafe*, 252 F.3d 1274 (11th Cir. 2001), to the effect that "[a]ny cause of action based on unfair competition [through Section 44 of the Lanham Act and the Paris Convention] must be grounded in the substantive provisions of the Lanham Act." 399 F.3d at 485. However, there is no reference either in the quoted passage or in the underlying Eleventh Circuit decision of an ability or inability to ground such a claim in state laws of unfair competition. The court talks only about a plaintiff's inability to assert new federal rights.

23

Critically, however, the Second Circuit immediately after the block quote explicitly addresses the issue of state law claims: "Therefore, we conclude that Cubatabaco cannot maintain a separate claim for unfair competition under Article 10bis [of the Paris Convention] and Sections 44(b) and (h). Rather, a claim for unfair competition must be brought under Section 43(a) or *state law*. See *Mattel*, 296 F.3d at 908; 399 F.3d at 485 (emphasis added).

Thus, while Section 44 and the Paris Convention do not create a federal common law of unfair competition, they do allow a foreign national to sue in a federal forum basing its unfair competition claim either on Section 43(a) or under a state law of unfair competition. The citation at the very end of the above quote to the Ninth Circuit's decision in *Mattel* strongly supports this interpretation. As discussed above, in *Mattel*, which also involved Section 44 and the Paris Convention, the Ninth Circuit held: "Mattel is entitled to assert a cause of action under the Lanham Act for trademark infringement, or for false designation of origin, or it may assert *state law claims for unfair competition*, as it did." 296 F.3d at 908. (emphasis added).

Indeed, *Mattel* cites favorably to the Ninth Circuit's earlier decision *Toho* for the authority that a foreign national is "entitled to the protection accorded . . . by any applicable state law of unfair competition . . . . [T]he practical effect of section 44 and this treaty is to provide a federal forum in which Toho can pursue its state claims." *Mattel*, 296 F.3d at 907. Accordingly, *Empresa* is consistent with the notion that Section 44 and the Paris Convention provide a federal forum where the plaintiff seeks to maintain *not a federal* tort of unfair competition, but one recognized by a *state* law of unfair competition.

Judge Rakoff recently read *Empresa* in precisely this fashion—to preserve Lanham Act/Paris Convention claims grounded on a state law of unfair competition. In *Almacenes Exito S.A. v. El Gallo Meat Market, Inc.*, 381 F.Supp 2d 324 (S.D.N.Y. 2005), Judge

Rakoff considered both federal and state claims brought through the Lanham Act and Paris Convention by a Columbian retailer. Judge Rakoff dismissed all of the federal trademark infringement claims because the plaintiff had neither registered its trademark nor made prior use of it in the United States and the Lanham Act does not recognize an exception to prior use for the "famous marks" doctrine.

As to plaintiff's state law claims, however, the court allowed the plaintiff to proceed in federal court because New York state law had fully adopted the famous marks doctrine in the case of *Maison Prunier v. Prunier's Restaurant & Cafe, Inc.,* 159 Misc. 551, 288 N.Y.S. 529 (1936). Indeed, the *Prunier* case, which was brought by a French national, had actually interpreted the Paris Convention in deciding the scope of New York law regarding the famous marks doctrine. Referring to the Second Circuit's decision in *Empresa*, Judge Rakoff held:

> The *Maison Prunier* court's reliance on the Paris Convention is not foreclosed by the Eleventh Circuit's ruling adopted by the Second Circuit in *Empresa Cubana*. For, as quoted above, the ruling was that the Paris Convention did not provide substantive rights "beyond those independently provided in the Lanham Act." .... ***Neither the Eleventh Circuit in Int'l Cafe nor the Second Circuit in Empresa Cubana said anything as to the Paris Convention's interplay with state common law.*** Moreover, the Lanham act has never been read to be preemptive of state trademark and unfair competition law.

*Almacenes Exito*, 381 F.Supp.2d at 329. (emphasis added).[15]

---

[15] This reading of *Empresa* is further buttressed by the Second Circuit's post–*Empresa* decision in *ITC Ltd. v. Punchgini*, 482 F. 3d 135 (2d Cir. 2007). Like *Maison Prunier*, this case focuses mostly on whether the "famous marks doctrine" applies to marks that become famous via use abroad but not in the U.S. But a footnote in the decision suggests that the Second Circuit still considers the *Toho* analysis to be valid in the Second Circuit regarding a Section 44/Paris Convention claim based on state law. In note 13, the Court states that the plaintiff "also asserted an unfair competition claim under section 44 of the Lanham Act," but that the plaintiff waived this claim by not pressing it on appeal. 482 F.3d at 153 n.13. The Court did not reject that claim as being precluded by *Empresa* or by the notion that Section 44/Paris Convention do not allow an unfair competition claim based on a state law of unfair competition.

*Empresa* also cites the Second Circuit's earlier decision in *Vanity Fair Mills, Inc. v. T. Eaton Co.*, 234 F.2d 633 (2d Cir 1956) for the proposition that the Paris Convention requires that the same treatment be accorded to foreign nationals as to domestic citizens. But, on the facts of *Vanity Fair*, the Second Circuit was addressing only whether Section 44's incorporation of the Paris Convention expanded rights geographically by making actionable conduct occurring outside of the United States. *Vanity Fair* does not foreclose the possibility that the incorporation of the Paris Convention by Section 44 expanded rights by making actionable conduct that does not violate the infringement provisions of the Lanham Act, but that violates state law.

Any other reading of *Empresa* would be inconsistent with the "national treatment" notion espoused in the decision. According to the *Empresa* Court, "[n]ational treatment means that 'foreign nationals should be given the same treatment in each of the member countries as that country makes available to its own citizens.'" *Empresa*, 399 F.3d at 485. U.S. companies can sue a foreign defendant for trade secret misappropriation under state law in federal court under diversity jurisdiction. But a foreign plaintiff, like INVISTA, absent the federal forum provided by the Lanham Act and the Paris Convention, would be relegated to state court for such a claim because of the quirk in diversity jurisdiction regarding aliens on both sides of the caption. The Paris Convention must therefore be construed to allow foreign plaintiffs to bring their state law misappropriation claims in federal court. Any other result would leave a foreign plaintiff in a worse posture than an American plaintiff with the same cause of action.[16]

---

[16] *See BP Chemicals, Ltd. v. Baloun*, 183 F.Supp. 1158, 1162 (E.D. Mo. 2000) ("If the national approach is taken, BP could maintain all causes of action available to U.S. citizens including those at common law and under the Lanham Act").

It makes perfect sense that Congress, in passing federal legislation to implement unfair competition treaties, would want to grant appropriate foreign parties access to the federal courts to assert unfair competition claims based on state law. Diversity jurisdiction is not a reliable source of federal jurisdiction for the foreign plaintiff. *See generally* Wright, Miller and Cooper, *Federal Practice and Procedure: Jurisdiction* 3d 3661 (discussing issue and collecting cases). Congress wanted the foreign national to have the same access to federal court as an American plaintiff.[17]

### D.    This Case Does Not Involve An Extraterritorial Application of the Lanham Act

Rhodia and DuPont argue that the Lanham Act claims should both be dismissed because they purportedly involve an extraterritorial application of U.S. law. (Rodia Mem. 7–11; DuPont Mem. 17–20). But this is not an accurate characterization of INVISTA's Complaint, which alleges acts of unfair competition occurring in the United States in support of both Lanham Act claims. Because the Complaint alleges U.S.–based anticompetitive acts, there is no issue of extraterritorial application of the Lanham Act. To the extent that INVISTA does allege that Rhodia is planning to use the stolen trade secrets to build a plant in Asia, the record shows that this foreign conduct has a substantial effect on U.S. commerce. (*See* Herzog Decl. ¶¶ 17–36). Accordingly, subject matter jurisdiction exists over the Lanham Act claims.

### 1.    The Lanham Act Claim Against DuPont

INVISTA has pled a Lanham Act claim against DuPont based on a state law of unfair competition and misappropriation of trade secrets and confidential information. This claim is brought pursuant to the Lanham Act Section 44 and the Paris Convention. (Compl. ¶¶

---

[17] The legislative history of the Lanham Act Section 44, which is reviewed in *General Motors Corp. v. Ignacio Lopez de Arriortua*, 948 F. Supp. 684, 689 (E.D. Mich. 1996), is consistent with this result.

92–98). DuPont is a U.S.–based corporation with headquarters in Wilmington, Delaware. INVISTA, though incorporated in Luxembourg, is headquartered in Wichita, Kansas. Thus, for all practical purposes, this dispute is between two U.S.–based corporations.

Although DuPont goes on for pages about the "foreign conduct" alleged in the Complaint, it ignores that the Section 44 Lanham Act claim *pled against DuPont* is based almost exclusively on DuPont's U.S. conduct. For example, the Complaint alleges that DuPont invented the Gen 1 technology *in Delaware* in the late 1960s and early 1970s; thereafter built commercial plants in Orange and Victoria, *Texas* using the trade secrets; disclosed the trade secrets to Rhodia at technical exchanges meetings *in Texas and Delaware*; sold the trade secrets to INVISTA in 2004 as part of a $4 billion transaction that was negotiated and performed in large part *in the United States*; met with Rhodia *in Delaware* and invested in Rhodia's new plant in violation of DuPont's 2004 contracts with INVISTA; gave technical, commercial, and legal advice to Rhodia and has supplied Rhodia *in Delaware* with confidential information about the Gen 1 process and about the businesses sold by DuPont to INVISTA; and has entered into a conspiracy with Rhodia *in Delaware* unlawfully to compete against INVISTA. (Compl. ¶¶ 1–3, 5, 9–10, 16, 22, 31, 39, 41–42, 51–53, 60, 83–85, 87–89, 94, 107, 110, 116–117).

These allegations charge DuPont with acts of unfair competition and trade secret misappropriation occurring in the United Sates. Although Rhodia may be planning to use the trade secrets abroad for a plant in Asia, DuPont's aiding and abetting of this scheme has occurred overwhelmingly in the United States. These allegations, which are assumed to be true for purposes of DuPont's Rule 12(b)(1) and Rule 12(b)(6) motion, are sufficient to implicate the Lanham Act and Paris Convention. *See BP Chemicals v. Baloun*, 183 F. Supp. 2d 1158 (E.D. Mo. 2000). INVISTA is not asking the Court to apply the Lanham Act extraterritorially insofar

28

as DuPont is concerned.  It is asking only that the Court apply U.S. law to DuPont's tortious and other acts in the United States.

### 2.    Lanham Act Claims Against Rhodia

INVISTA asserts two separate Lanham Act claims against Rhodia—one for false advertising under Lanham Act Section 43(a) and the second for misappropriation of trade secrets under Lanham Act Section 44 and the Paris Convention.  With respect to the Section 43(a) claim, the Complaint specifically alleges that Rhodia made false and misleading claims of technology ownership to DuPont, Chevron Phillips, and other ADN customers in the United States.  (Compl. ¶¶ 5, 32, 69–73, 75, 76, 100).  These allegations alone preclude dismissal of the Section 43(a) claim at this preliminary pleading stage.  *See Ace Novelty Co., Inc. v. Vijuk Equipment, Inc.*, No. 90 C 3116., 1990 WL 129510, at *7 (N.D. IL. 1990) (denying motion to dismiss); *International Technologies Consultants, Inc. v. Steward*, F.Supp.2d 750, 756, 761 (E.D. Mich. 2008) (same); *Tao of Systems Integration, Inc. v. Analytical Services & Materials, Inc.* 299 F.Supp.2d 565, 572-574 (E.D. Va. 2004) (same)

Regarding the Lanham Act Section 44/Paris Convention claim against Rhodia, the Complaint again alleges acts of unfair competition and wrongdoing occurring in the United States.  It alleges, for example, that Rhodia obtained disclosure of the trade secrets at technical exchange meetings *in Delaware and Texas*; met with DuPont *in Delaware* and induced DuPont *in Delaware* not only to breach agreements with INVISTA, but to disclose to Rhodia confidential and technical information that was sold to INVISTA in the 2004 transaction; and entered into a conspiracy with DuPont *in Delaware* unlawfully to compete against INVISTA and steal its confidential, technical, and proprietary information.  (Compl. ¶¶ 4, 12–13, 22, 24, 31–32, 52, 82–84, 87–90, 94, 100 ).

To be sure, the Complaint does allege some foreign conduct by Rhodia, including misappropriation of certain of the trade secrets from the Butachimie joint venture in France and use of those trade secrets to build a new ADN plant in Asia. (Compl. ¶¶ 4–6, 77–79, 94). However, the record is clear that these foreign acts may still be deemed to violate the Lanham Act because they have "substantial effects" on U.S. commerce. *See Atl. Richfield Co. v. ARCO Globus Int'l Co.*, 150 F.3d 189, 192 n. 4 (2d Cir.1998) (Lanham Act applies extraterritorially if there is a substantial effect on U. S. commerce); *Vanity Fair Mills,* 234 F.2d at 642.; *Warnaco Inc. v. VF Corp.,* 844 F.Supp. 950 (S.D.N.Y.1994).

As the accompanying Declaration of Benjamin Herzog makes clear,[18] if Rhodia goes forward and builds an ADN plant in Asia, using technology stolen from INVISTA, the impact on the U.S. commerce would be immediate and substantial. INVISTA currently exports more than 100 kilotons of ADN to Asia each year from its plants in Texas. INVISTA has already made massive initial investments in its Asian expansion plans, and would use its new plant meet increases in Asian ADN demand. However, if Rhodia, through misappropriation and unlicensed use of INVISTA's trade secrets, were to build a plant in Asia, it would foreclose INVISTA from building its own plant in Asia. (Herzog Decl. ¶¶ 18, 20–21). It would also foreclose INVISTA from using output from the new plant for its own downstream uses of ADN. (Id., 30).

More basically, such a plant would have a direct and substantial impact on the U.S. ADN market. As the Herzog Declaration makes clear, Rhodia's continued misappropriation (1) makes shipments from INVISTA's Texas plants cost–prohibitive and thus impacts the volume of exports from the United States to Asia; (2) causes the operational costs of

INVISTA's Texas ADN plants to increase; (3) forces INVISTA's Texas plants to run below capacity or sell at significantly lower margins; (4) causes lost profits to INVISTA because Rhodia will be using misappropriated technology to usurp INVISTA's position as market leader; (5) interferes with the supply of raw materials to INVISTA's Texas plants; and (6) decreases margins, impacting jobs, spending, and R&D at INVISTA's research facilities in Orange and Houston, Texas. (Herzog Decl. ¶¶ 22–29, 31–35)

Rhodia's misrepresentations of ADN technology ownership also cause customer confusion in the United States as to who owns the Gen 1 technology, and damage INVISTA's goodwill and reputation as a technology leader. (Herzog Decl. ¶¶ 11–15). As a U.S.–based company with headquarters in Kansas and substantial ADN operations in Texas, this harm to INVISTA's goodwill and reputation has been felt directly in Kansas and Texas. (Herzog Decl. ¶¶13–15). As Rhodia itself stated to the Texas court, "[t]he extent that any harm would be suffered by the Plaintiff or its parent, it would be suffered either in its place of incorporation or its principal place of business." (Brockett Decl. Ex. L).

Courts have held "effects" similar to these to be sufficient for application of the Lanham Act to foreign conduct. *See Software AG, Inc. v. Consist Software Solutions, Inc.*, No. 08 Civ. 389, 2008 WL 563449 at *14, slip op. (S.D.N.Y. Feb. 21, 2008) (finding a substantial effect where misrepresentations led to confusion among foreign customers, threatened contracts with existing customers, and led potential customers to refuse to do business with plaintiff); *Rodgers v. Wright*, 544 F.Supp.2d 302, 313 (S.D.N.Y. 2008) (stating that harm to goodwill suffices, and finding substantial affect where there was confusion among domestic and foreign customers); *Calvin Klein Industries v. BFK Hong Kong, Ltd.*, 714 F.Supp. 78 (S.D.N.Y.1989)

---

[18] INVISTA is permitted to submit declarations and other evidence when defendant makes a facial challenge to (footnote continued)

(finding substantial effect based on potential for diverted foreign sales, harm to licensees, and damage to plaintiff's goodwill and reputation).

### III.   THIS COURT HAS SUPPLEMENTAL JURISDICTION OVER INVISTA'S STATE LAW CLAIMS

The Court's exercise of supplemental jurisdiction over INVISTA's state law claims against Rhodia and Dupont is proper under 28 U.S.C. § 1367.  A district court has supplemental jurisdiction over state law claims that "derive from a common nucleus of operative fact."  *See United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 725 (1966); *Jones v. Ford Motor Credit Co.*, 358 F.3d 205, 213-14 (2d Cir. 2004).  Federal courts routinely exercise supplemental jurisdiction over state law claims that form part of the same case or controversy as a Lanham Act cause of action.[19]

The facts supporting the Lanham Act and related state law causes of action are intimately interwoven, and neither Rhodia nor DuPont contends otherwise.  Although some of the state law claims may require additional proof beyond that necessary to support INVISTA's Lanham Act claims, "this alone is insufficient to prevent the exercise of supplemental jurisdiction."  *Innovative Networks, Inc. v. Satellite Airlines Ticketing Ctrs., Inc.*, 871 F.Supp. 709, 726 (S.D.N.Y. 1995), *citing Brown v. Bronx Cross County Medical Group*, 834 F.Supp. 105, 109 (S.D.N.Y.1993).

As long as at least one federal claims survives, federal courts will exercise their power to hear related state law claims.  *See, e.g, Chapdelaine Corporate Secs. & Co. v.*

---

jurisdiction under Fed.R.Civ.P. 12(b)(1).  *See Kamen v. American Tel. & Tel. Co.*, 791 F.2d 1006, 1010-1011 (2nd Cir. 1986)

[19]   *See, e.g., Time Warner Cable, Inc. v. DIRECTV, Inc.*, 475 F.Supp.2d 299 (S.D.N.Y. 2007) (Lanham Act 43(a), deceptive business practices under New York law, and common law breach of contract); *Polygram Merchandising, Inc. v. New York Wholesale Co.*, No. 97 Civ. 6489, 1999 WL 4957 (S.D.N.Y. Jan. 6, 1999) (Lanham Act 43(a) and, *inter alia*, New York Civil Rights Law, unfair competition, improper transfer of assets, and failure to comply with bulk sale requirements); *Innovative Networks, Inc. v. Satellite Airlines Ticketing Ctrs., Inc.*, 871 F.Supp. 709, (S.D.N.Y. 1995) (Lanham Act 43(a) and, *inter alia*, unfair competition by misappropriation, tortious interference with contract, breach of contract, and conspiracy).

*Depository Tr. & Clearing Corp.*, No. 05 Civ. 10711, 2006 WL 2020950 at *6 n.84 (S.D.N.Y.,

July 13, 2006) (after dismissal left only plaintiff's antitrust claim and state law claims, the court

noted: "Because one federal claim has survived the motion to dismiss, I do not address the

question of supplemental jurisdiction."); *Int'l. Techs. Consultants, Inc. v. Steward*, 554

F.Supp.2d 750, 753 (E.D. Mich. 2008) ("So long as [plaintiff's Section 43(a)] claim survives, the

challenge to this court's subject matter jurisdiction over the state law claims would be

unavailing").

Thus, here, if either INVISTA's Lanham Act Section 43(a) claim or its Lanham

Act Section 44/Paris Convention claim is sufficiently pled, the remainder of the claims clearly

fall within this Court's supplemental jurisdiction.

## CONCLUSION

Defendants' motions to dismiss should be denied.


New York, New York
Dated:  September 29, 2008

QUINN EMANUEL URQUHART OLIVER &
HEDGES, LLP

Michael B. Carlinsky
(michaelcarlinsky@quinnemanuel.com)
Daniel L. Brockett
(danbrockett@quinnemanuel.com)
Robert C. Juman
(robertjuman@quinnemanuel.com)
51 Madison Avenue, 22nd Floor
New York, NY 10010
(212) 849–7000



CURTIS, MALLET–PREVOST, COLT &
MOSLE LLP

Joseph D. Pizzuro
(jpizzuro@curtis.com)
Turner P. Smith
(tsmith@curtis.com)
101 Park Avenue, 35th Floor
New York, New York, 10178
Tel.:  (212) 696–6000
Fax:  (212) 697–1559

*Attorneys for INVISTA S.à r.l., INVISTA
Technologies S.à r.l. and
INVISTA North America S.à r.l.*